**Guy D. SCHOOLER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15455.**

United States Court of Appeals Eighth Circuit.

April 13, 1956.

Herschel G. Langdon, Des Moines, Iowa, and J. O. Watson, Jr., Indianola, Iowa, for appellant.

Roy L. Stephenson, U. S. Atty., Des Moines, Iowa (Robert J. Spayde, Oskaloosa, Iowa, and John C. Stevens, Asst. U. S. Attys., Des Moines, Iowa, on the brief), for appellee.

Before WOODROUGH and VAN OOSTERHOUT, Circuit Judges, and HULEN, District Judge.

HULEN, District Judge.

Appellant appeals from a judgment based on a jury verdict of guilt on five counts of an indictment charging viola-

tion of 18 U.S.C. § 220.[1] Reversal is sought solely on the ground that the trial court erred in overruling the motion for judgment of acquittal. Our ruling must turn on the narrow issue as to what meaning shall be given to the word "acceptance" as used in the statute.

Appellant was an officer of the Hartford-Carlisle Savings Bank. Its deposits were insured by the Federal Deposit Insurance Corporation. Hence this Court has jurisdiction. The indictment charges in each of five counts that during 1952 appellant received and agreed to receive a fee, gift or commission from one Stevens for procuring for Stevens the acceptance of checks by the bank. Each count of the indictment charges a separate offense on a specific date. The fee or gift received by appellant was $100.00 in the offenses set out in each of the first four counts, and $500.00 in the fifth count.

The facts are not in dispute. Government Exhibit 16 is a summary showing Stevens' checks drawn on and paid by the Hartford-Carlisle Savings Bank during the period April 1, 1952, to September 30, 1952. There were 419 checks totaling $2,341,847.47. There was evidence of delayed posting on some of the checks. Had certain checks been posted when received, the Stevens account would have been overdrawn. In answer to this showing by the Government appellant offered evidence that the bank followed a practice—and a legal one—of delayed posting.[2] None of Stevens'

checks were paid until there was sufficient money in his account to pay them.

In each case Stevens covered his checks soon enough that, because of the bank's delayed posting custom, at no time was the bank required to return the checks for insufficient funds. In the manner of posting checks, the bank followed no different procedure with respect to any of its other accounts. This phase of the case is of minor importance on the issue presented on this appeal.

Stevens opened his account in January of 1952. Shortly thereafter he brought in a letter from the Cambridge State Bank of Cambridge, Iowa, recommending him as a proper customer for the Hartford Bank. He told appellant he was in the used car business. The bank had advised Stevens it would not pay any checks on uncollected funds. For a time Stevens brought in his deposits in the form of cash. Appellant then told Stevens that the large amounts of cash were a nuisance to the bank and asked Stevens to take his account elsewhere. Appellant testified that it was at this time that Stevens offered to pay the bank $100.00 a month to maintain the account. Stevens, as a Government witness, testified that he gave appellant sums of money—he didn't know exactly how much— and told appellant "that was for doing me a favor when I was out of town and couldn't get back, for taking care of the checks, until I could get in." Appellant testified that he put the money which Stevens left at the bank in an envelope

1. "Whoever, being an officer, director, employee, agent, or attorney of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation of a Federal intermediate credit bank, or of a National Agricultural Credit Corporation, except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm, or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank or corporation, any loan or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such bank or corporation * * *."

2. Under section 541.201 of the Code of Iowa of 1954, I.C.A. and under Operating Circular No. 17 of the Federal Reserve Bank of Chicago, in any case in which a bank receives other than for immediate payment over the counter a check payable by, at, or through such bank, such bank may have until midnight of its next business day to dishonor or refuse payment of such item. There is no proof in this case that the bank ever held any check of Stevens past midnight of the next business day after it was received.

which he kept in what they called the silver chest, and did not credit it to an account in the bank at that time because of his uncertainty about the OPA regulations concerning charges for checking account services. On October 4, 1952, when Stevens' account was closed on order of the Superintendent of Banking, a credit was made to Collection and Exchange for the cash in the envelope—amounting to $500.00.

All checks handled by the bank for Stevens were perforated with the date of payment. The bank never made any loans to Stevens.

The Government's position is that the receiving or accepting of the checks by the bank in the manner described violated the statute proscribing the receipt of a fee or gift for procuring "acceptance" of a check by a bank. There is no claim by the Government that any check of Stevens was accepted by the bank within the meaning of the term "acceptance" as used in the negotiable instrument law. On the other hand, appellant urges that since there was no "acceptance" of any check of Stevens as used in the negotiable instrument law, there was no violation of the statute.

18 U.S.C. § 220 stems from 12 U.S.C.A. § 595, which underwent its first change in the revision of the Criminal Code of 1948. Section 595, prior to 1948, applied to officers, directors and certain employees of a member of the Federal Reserve System. Section 595 did not contain the word "acceptance." In the 1948 revision the word "acceptance" was inserted, but the Act still did not extend to banks insured by the Federal Deposit Insurance Corporation. In 1950 the Act was amended to include officers, directors, employees, agents or attorneys of any bank, "the deposits of which are insured by the Federal Deposit Insurance Corporation."

Under the historical and revision notes to the statute we find the following:

"* * * The punishment provisions of the three sections were identical, and all other provisions thereof were similar, except that section 595 of said Title 12, relating to officers, directors, employees, or attorneys of member banks of the Federal Reserve System, did not include the terms 'agent' and 'acceptance' and did not include the phrase 'or extension or renewal of loan or substitution of security.'

* . * . * * . * *

"Verbal changes were made for style purposes. 80th Congress House Report No. 304.

"1950 Amendment. Act Sept. 21, 1950, amended section to prohibit any officer, director, or employee of, or attorney or agent for, an insured bank from receiving fees or gifts for *procuring loans*." (Emphasis added.)

■ Can a check by "acceptance" become the substance of and represent a loan. If so, how? Under the negotiable instrument law the "acceptance" of a check has a well recognized, specific and definite meaning. Acceptance of a check must be in writing and signed by the drawee bank.

■ "The acceptance of a check contemplates a promise on the part of the drawee to pay the same, and is essentially different from the payment thereof. Payment is the natural and legitimate end of a check, whereas an acceptance adds to its original vitality a new element of force and strength calculated to prolong its existence and widen its sphere of usefulness. When there is an acceptance, a contractual relationship arises between the holder and the drawee and consequently there is a promise to perform; when there is a payment, there is an actual performance. It has, accordingly, been ruled that payment of a check is not acceptance within the meaning of the statutory provision that acceptance or certification of a check discharges from liability the drawer and all indorsers thereon." 7 Am.Jur., Banks § 554.

"*  *  * [P]ayment and acceptance are essentially different. Payment is the natural, expected, and intended end of a check. Acceptance strengthens the vitality of a check, and serves to prolong, rather than to terminate, the life of it. *  *  *" Hunt v. Security State Bank, 1919, 91 Or. 362, 179 P. 248, 251.

Did Congress use the word "acceptance" in the statute pertaining to bank transactions in the negotiable instrument sense? Or is the use of this word as the Government claims:

"It is submitted that under Section 220 formal written acceptance of bills of exchange in the technical sense may be included, but to limit the statute to that definition would be to thwart the intent of the Statute to penalize bribery and graft in a large variety of banking transactions including the vast banking business of receiving and paying checks."

If we trace further the history of Section 220, it is to be seen that it has a bearing on the meaning of "acceptance" as it is used in the statute. Section 220 is based on *three* prior sections of the Code: 12 U.S.C.A. §§ 595, 1125, and 1315. Section 595 applied to officers, employees, etc., of Federal Reserve and member banks; Section 1125 applied to officers of Federal intermediate credit banks; and Section 1315 applied to officers of National Agricultural Credit Corporations. In the 1948 revision of United States criminal statutes, Congress consolidated these sections in 18 U.S.C. § 220. Of the three statutes referred to only 12 U.S.C.A. § 595 did not contain the word "acceptance." Their punishment provisions were practically identical. Since 18 U.S.C. § 220 is a consolidation of the three sections, the word "acceptance" as there used should take on the same meaning which it had in 12 U.S.C.A. §§ 1125 and 1315.

Section 1315 of Title 12 was enacted into law as Section 216(e) of the Ag-

ricultural Credits Act of 1923. Section 216(a) of this same Act, 12 U.S.C.A. § 1311, provided in part:

"Any officer, director, agent, or employee of a National Agricultural Credit Corporation who embezzles, abstracts, purloins, or willfully misapplies any of the moneys, funds, or credits of such corporation, or who, without authority from the directors, draws any order or bill of exchange, makes any *acceptance*, issues, puts forth, or assigns any note, debenture, bond, draft, bill of exchange, mortgage, judgment, or decree *  *  * shall be deemed guilty of a misdemeanor *  *  *." (Emphasis added.)

Section 1125 of Title 12, enacted at the same time as Section 1315, was Section 211(e) of the Federal Farm Loan Act. Section 211(a) of this Act, 12 U.S. C.A. § 1121, is identical to the quoted part of Section 216(a) of the Agricultural Credits Act except that "Federal intermediate credit bank" is substituted for "National Agricultural Credit Corporation."

We conclude it would do violence to rules of statutory construction to hold that the use of the word "acceptance" in Sections 216(a) and 211(a), when considered in context, is not the negotiable instrument use of the word.

As stated in 82 C.J.S., Statutes, § 348 (1953):

"In the absence of anything in the statute clearly indicating an intention to the contrary, where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout; and, where its meaning in one instance is clear, this meaning will be attached to it elsewhere *  *  *."

Therefore, in the absence of a showing of a contrary intention on the part of Congress, "acceptance" in Section 216(e) and in Section 211(e) should be interpreted in the negotiable instrument sense. Resultantly, "acceptance"

as used in 18 U.S.C. § 220 should be given this same meaning.

If, as the Government contends, the intent of the statute was to cover "receiving and paying checks," we must read into the statute words that are not there. Here Congress was amending a statute that had to do with commercial papers, governed by the negotiable instrument laws of the various states. Congress knew that in relation to the subject matter of their legislation the word "acceptance" had a definite meaning. They knew it did not include the mere "receiving and paying of a check." If Congress desired to extend the statute beyond bank loan transactions, which was all that the original statute encompassed, we must conclude they would ..ave said so and not left it to the courts to legislate by broadening the terms of the statute. Indeed if we consider the subject matter of the Act, namely negotiable paper, together with the language used in the Act, the meaning is not ambiguous. Confusion results when an attempt is made to read into the law words which are not there.

Consider the subject from abstract reasoning. It would be absurd to assume that Congress intended the statute to cover and to make a crime of the receiving and paying of a check, when the drawer had a balance sufficient to cover the cashing of the check. In such a case there would be no reason for the payment of any fee to anyone connected with the bank. On the other hand, if any employee having access to the bank's funds should, for a consideration, cause them to be paid on a check on an account with insufficient or no funds, he would be subject to prosecution for fraud under 18 U.S.C. § 656. See Seals v. United States, 8 Cir., 1955, 221 F.2d 243; United States v. Klock, 2 Cir., 1954, 210 F.2d 217. The provisions of the latter section are so broad that Congress could not have intended to duplicate its provisions by the Act in question.

■ As stated by the Court in Farmer v. United States, 10 Cir., 1942, 128 F.2d 970, 972:

"A criminal statute. must. be strictly construed [citing, *inter alia,* Gesell v. U. S., 8 Cir., 1924, 1 F.2d 283, 286]. Ambiguity in criminal statutes should not be resolved so far as to embrace offenses not clearly within the law. The facts charged and proved must bring the defendant plainly and unmistakably within the statute."

The Government must of necessity take the position that there is some ambiguity in the law to argue that "acceptance" means "receiving and paying" as applied to a check. To find such an offense covered under the statute in question is to broaden coverage to subjects that are not "clearly within the statute."

The judgment of the District Court is reversed and this case is remanded with directions to enter judgment of acquittal.