(C.D. 2704)

ACME VENETIAN BLIND & WINDOW SHADE CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 8, 1966)

*Allerton deC. Tompkins* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Arthur H. Steinberg*, trial attorney), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: The merchandise involved in this case was entered in 1960 and 1961.[1] It is described on the invoices as "Unwoven Wooden Blind Material, Mahogany Sticks" or "Unwoven Wooden Blind Material, Philippine Mahogany Slats," and is in the following sizes:

$$^{15}\!\!/_{16}'' \times ^{1}\!\!/_{10}'' \times 80'' \qquad\qquad ^{7}\!\!/_{16}'' \times ^{1}\!\!/_{10}'' \times 74''$$
$$^{15}\!\!/_{16}'' \times ^{1}\!\!/_{10}'' \times 96'' \qquad\qquad ^{7}\!\!/_{16}'' \times ^{1}\!\!/_{10}'' \times 96''$$

It was assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373, and T.D. 52476, as manufactures in chief value of wood, not specially provided for. Four claims were made in the protest, one of which has been abandoned. Those remaining are (1) that the merchandise is free of duty under paragraph 1803 of said tariff act, as lumber not further manufactured than planed, and tongued, and grooved, but is subject to internal revenue tax under section 4551(1) of the Internal Revenue Code of 1954,[2] as modified by the General Agreement on Tariffs and Trade, T.D. 51802; (2) that it is free of duty under paragraph 1806 of said tariff act as sticks of wood in the rough or not further advanced than cut into lengths suitable for sticks for sunshades, and (3) that it is dutiable at 10 per centum ad valorem under paragraph 1558 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, and T.D. 52827.

The pertinent provisions of the statutes are as follows:

[Par. 412, as modified by T.D. 52373 and T.D. 52476,
*supra*] Manufactures of wood or bark, or of which
wood or bark is the component material of chief
value, not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other (except * * *) _____ 16⅔% ad val.

---

[1] The case was tried at New York and submitted before Judges Oliver and Wilson, June 2, 1964. Plaintiff's brief was filed April 9, 1965. Defendant's brief was filed January 27, 1966.

[2] Formerly section 3424 of the Internal Revenue Code of 1939.

Par. 1803. Wood: (1) * * * sawed lumber and ··
timber, not further manufactured than planed,
and tongued and grooved; * * * all the fore-
going not specially provided for. [Free]

[Section 4551(1) of the Internal Revenue Code
of 1954, as modified by T.D. 51802, *supra*]
Lumber, including sawed timber, rough or
planed or dressed on one or more sides
(except * * *):

 * * * * * * *

Other _____ $1.50 per 1000 ft.
 board measure

Par. 1806. Woods: Sticks of partridge, * * *
and other woods not specially provided for, in
the rough, or not further advanced than cut into
length suitable for sticks for umbrellas, parasols,
sunshades, whips, fishing rods, or walking canes. [Free]

[Par. 1558, as modified by T.D. 52739 and T.D.
52827, *supra*] Articles manufactured, in
whole or in part, not specially provided for
(except * * *)_____ 10% ad val.

This case is a retrial of the issues involved in *Morris Friedman* v.
*United States*, 51 Cust. Ct. 88, C.D. 2415, the record of which was
incorporated herein. A summary of the facts in the incorporated
record appears in that decision. The court held that the articles
were properly classified by the collector as manufactures of wood on
the ground that they had been ordered by specification in particular
sizes, had been so far advanced to completion as articles that they
could be used only for definite purposes, viz, with woven tape, and
not generally as wood material.

The imported merchandise is represented by exhibit 1 in the incor-
porated case and exhibit 8 herein. These are slats 7/8 of an inch
wide and 1/10 of an inch thick but in shorter lengths than the imported
articles. The surfaces of the slats are smooth and the edges are smooth
and rounded. Joseph Rosenfeld, president of the plaintiff corpora-
tion, who also testified in the previous case, stated that the slats are
made from wood material, such as exhibit 7, which is a rough board
about 4 inches wide and 1/4 of an inch thick. According to the wit-
ness, such boards are run through a machine having so-called planer
cutters top and bottom, through whose operation the wood is cut into
four slats, such as those in exhibit 8. The wood is also thinned down
to a thickness of approximately 1/10 of an inch, the surfaces are planed,
and the edges rounded. This is all done in one operation. The wit-
ness produced one of the planer cutters which are used on the Japanese
machine, some of which he had purchased. It is a piece of metal,
about 4 1/4 inches long, with one edge separated into four parts by five

triangular-shaped tips. The witness explained that the tips have to have a slight radius or thickness at the base or they would break off in one revolution. This thickness causes a slight roundness to be formed on the edges of the slats. According to Mr. Rosenfeld, it makes no difference whether the edges are square or rounded.

Mr. Rosenfeld testified that he orders the slats in 80- and 96-inch lengths, but they come in from an inch to an inch and a half longer. After importation, they are trimmed to make them uniform, sanded, sealed with a primer, tumbled in hot air, painted, dried, and brought to the looms where they are woven with vinyl. The woven product is trimmed and is ready for processing into various articles, such as room dividers, folding doors, and screens. Sixty-five to 70 percent of the slats used in weaving are painted. They are trimmed before painting in order not to waste paint and to cut off split ends.

The witness stated that sunshades or pull-up blinds are made by weaving slats together with cord every 4 inches, so that there are air spaces between the slats. They are made with a spring roller, or with a cord and pulley so that they roll up from the bottom. Slats are cut to various sizes for roll-up and pull-down shades. When the same material is used vertically, it forms a screen.

Mr. Rosenfeld testified that slats are ordered to specification, usually in 80- and 96-inch lengths, because a good part of the firm's work is done with those sizes and such slats may be cut down for making other articles. The slats never come in exactly the sizes ordered and it would require a larger stock to carry every individual size. The 80-inch size is used for door heights, but it is also cut down into shorter lengths for other purposes.

The firm sells finished slats cut to lengths ranging from 4 inches to 5 feet to purchasers who make other articles. All such slats are sanded and about 30 to 40 percent are painted according to the color selected by the purchaser.

One of the articles manufactured from such slats is the Tambour door which is made by gluing or laminating the slats to a cloth backing. Another article is a wall covering made by gluing the sticks to a paper backing. The slats are also used in small lengths for making parquet floors by do-it-yourself people, as designs in front of the cloth grill on speakers in Hi-Fi cabinets and in automobile backrests.

Plaintiff called two other witnesses, Alphonse Fiore and Dominick Lapetina, and defendant called two, John E. Hough and Fred F. Skeris. Mr. Fiore is vice president of Flushing Mills, Inc., which converts or mills and planes and surfaces lumber to dimension moldings. He is a graduate of North Carolina State Forestry College, is a sales representative for many lumber companies, and is engaged in selling all types of lumber. Mr. Lapetina has been engaged in handling

woodworking machinery since 1940. Mr. Hough is president and general manager of the Hough Manufacturing Co., which makes folding doors, wood slats, wood panels, moldings, dimension stock, and the like. Mr. Skeris is mill foreman of the Brooklyn Molding Co. which makes moldings and dresses lumber. Their testimony dealt chiefly with the distinction between molded and planed lumber, and as to that issue is not summarized herein because it is apparently not relevant.

Mr. Fiore said that exhibits 1 and 8 are thin pieces of lumber derived from a log. They are called slats or slatted pieces of lumber in the trade. Other types of lumber that have specific names are laths, furring strips, base moldings, crown moldings, picture frame moldings, rough lumber, surface lumber, planed lumber, tongue and grooved lumber, shiplap lumber, posts, deals, and staves. His firm did not stock $\frac{1}{10}$ of an inch mahogany slats because they had a limited use for a particular market, whereas lumber in the rough state is more versatile and can be converted to any type of lumber desired.

Mr. Hough was in agreement that exhibit 8 is known in the trade as a slat, but did not consider it to be lumber, but a specialized item manufactured from lumber, having more limited uses than lumber.

Mr. Hough testified that his firm produces woven slatted folding doors and has in the past manufactured shades and screens. His experience with slats like exhibit 1 was confined to woven slatted material used in such articles. He had heard of the uses described by Mr. Rosenfeld for the first time at the trial, although his firm was interested in finding markets for its slats. It had had no success except for incidental quantities, experimental products, occasional home crafting or noncommercial uses.

We take up plaintiff's claims in the order of the advantage plaintiff would derive from them if sustained. The claim for free entry under paragraph 1806 comes first as it would apparently exempt plaintiff from the internal revenue tax also.

Plaintiff's claim under paragraph 1806, is at first glance troublesome but consideration removes the difficulty. It is true that by Webster's New International Dictionary (2d edition, unabridged) the second of the two meanings given for "sunshade" is "an awning." The importations are, arguably, "sticks"—at least, as in "hockey stick," the word does not necessarily imply a cylindrical or natural wood shape. They are not processed beyond cutting to length, inasmuch as cutting to awning lengths is done after importation. They are "suitable" for awning uses even if not chiefly so used. The Government argues *noscitur a sociis* which we view as not conclusive by itself in light of the frequent disorderly arrangement of the old tariff sched-

ules. See our observations in *Hayes-Sammons Chemical Co. et al.* v. *United States*, 56 Cust. Ct. 115, C.D. 2618. It is true, though, the argument is stronger when, as here, it is based on items within a single paragraph, because we know, then, that they came before the same congressional subcommittee at the same time, to whom incongruity of arrangement would have been more immediately obvious.

We think a reference to paragraph 1554 of the Tariff Act of 1930 will resolve the problem. It reads:

Par. 1554. Umbrellas, parasols, and sunshades, covered with material other than paper or lace, not embroidered or appliqued, 40 per centum ad valorem; * * * handles and sticks for umbrellas, parasols, sunshades, and walking canes, 40 per centum ad valorem, * * *.

Similar language appeared in previous tariff acts—paragraph 1456, Tariff Act of 1922; paragraph 383, Tariff Act of 1913; paragraph 478, Tariff Act of 1909. The Summary of Tariff Information, 1929, states (p. 2151):

Umbrellas, parasols, and sunshades consist of three parts: (1) Tubes, ribs, and stretchers, usually made of steel, (2) covers, made of silk, cotton, or cotton and silk, and (3) handles, made of wood, horn, ivory, synthetic phenolic resin, and other materials, * * *.

To interpret "sunshade" in this paragraph as including awnings would make the paragraph grotesque. Manifestly, the sunshades referred to are such as have "handles" and are "covered." It is clear, therefore, and without ambiguity, that "sunshade," in paragraph 1554 and its predecessors, is one held in the hand like a parasol or umbrella, with ribs, etc., and a cover of some textile, and that article only. The 1922 act provisions were the starting point for all congressional deliberations on the 1930 act, and there is a presumption, absent evidence to the contrary, that words used in both acts mean the same in both. This is particularly true where earlier provisions were reenacted without material change. *Cf. Morganite, Inc.* v. *United States*, 42 CCPA 207, C.A.D. 595; *Art & Sign Brush Mfg. Corp.* v. *United States*, 34 Cust. Ct. 151, C.D. 1697. Words used in the same act in two different places are presumed to mean the same in both. *Schooler* v. *United States*, 231 F. 2d 560. Therefore, "sunshade" in paragraph 1806 of the 1930 act does not include awnings and that paragraph does not describe the merchandise involved here.

This is one of the instances which we believe to be numerous in the aggregate, where dictionary definitions afford misleading indications as to the intent of Congress. It is the latter, of course, which must be our lodestar.

Next, we take up the claim under paragraph 1803, which acknowledges that if it is sustained, Internal Revenue Code, section 4551(1), applies.

A careful reader of our decision in the incorporated case will observe that the controlling assumption then was that plaintiff, to sustain its protest and obtain classification under paragraph 1803, had to prove that the merchandise was planed and not molded. This it attempted to do also on the retrial. But meanwhile, the distinction had lost its validity. In *Best Moulding Corp.* v. *United States (Brown, Alcantar & Brown, Inc., Party in Interest)*, 51 CCPA 7, C.A.D. 829, our appellate court held that stock wood shapes produced on a molding machine were not advanced beyond planing, because planing includes molding. The impact of this decision was felt in *Border Brokerage Co. et al.* v. *United States*, 52 Cust. Ct. 204, C.D. 2461, where we held that wood stock dedicated for use as sides for furniture drawers was not advanced beyond planing because bullnosed, eased, and grooved, all these evidently being molding operations. The decision in the instant incorporated case is not mentioned in that opinion, which refers only to authorities "considered necessary to support the reasoning followed and the conclusion reached." (P.210.)

The samples before the court in that case are happily still in its custody, and have been reexamined during the preparation of this opinion. So has the record. The operation performed simultaneously on the lumber therein, before importation, rounded the portion of the drawer side which was intended to be its top in the finished drawer. (Bullnosing.) It rounded more slightly the bottom edges. (Easing.) It cut a deep slot from end to end, about 3/4 of an inch above the bottom. (Grooving.) The slot was to receive the sheet of veneer constituting the bottom of the drawer. All this advanced the raw lumber well along towards its completion as part of a finished drawer, and removed it from any other utility, but we held that the merchandise was lumber not advanced beyond planing, etc., and properly classified under paragraph 1803. The instant merchandise would seem to the ordinary mind to fall under the same classification *a fortiori*. Its cross section, as molded or planed (it makes no difference which), is a simple rectangle except for slight rounding of the corners, while in the *Border Brokerage* case, *supra*, the cross section is a complex construction having no recognized geometrical name.

Earlier cases have held that a wood product may be a manufactured article, advanced beyond the free list paragraph, although not processed beyond sawing and planing, etc., if (a) it has become an article having a single distinct name and function: *United States* v. *C. S. Emery & Co.*, 18 CCPA 208, T.D. 44399 (thresholds), or (b) if it is a part of a manufactured article unassembled: *C. J. Tower & Sons* v. *United States*, 40 CCPA 30, C.A.D. 493 (unassembled shipping crates). However, we held in *C. S. Emery & Company* v. *United States*, 28 Cust. Ct. 303, C.D. 1427, that boards cut to shape to specification for use in making silos remained lumber, not further manufactured than planed

and tongued and grooved. This decision was promulgated 2 weeks earlier than the *Tower* case, *supra*, and, therefore, we had no opportunity to consider whether the latter would have required a different result, but on review now it does not seem inconsistent.

The conclusion must follow that wood products not processed beyond sawing and planing, etc., do not lose their character as lumber by reason of being dedicated to a particular use unless they are a new and different article, having a specific name and function, or an unassembled part thereof. This was our holding in the *Border Brokerage* case, *supra*, where the wood stock was dedicated to become drawer sides, to the exclusion of all other uses, but had operations remaining to be performed on it to make it a drawer side ready for assembly in a finished drawer.

Plaintiff herein we find has failed to prove that when imported, the articles involved and other imports having the same specifications (as, e.g., the imports made by Government witness Hough) had any known use except the manufacture of shades, screens, folding doors, room dividers, and other articles in that family, produced by interweaving slats with vinyl tape or cord. Within that family they were dedicated to particular products only after importation by cutting to exact length, sanding, priming, and painting.

The testimony as to uses of the involved articles after importation all related to uses at the time of trial, which in the incorporated case was 1961, and in the new case, 1964. For example, in the new case, the witness based his testimony about the claimed new use of the imports for "Tambour doors" on what he had seen at "the Chicago show this year." All concerned with both trials would seem to have been oblivious of the rule our appellate court was to announce in *Randolph Rand Corp. et al.* v. *United States*, 53 CCPA 24, C.A.D. 871 (February 17, 1966), that one attacking a collector's classification by showing uses other than the collector's presumed findings must show them as of about the time of importation.

However, the trial in the incorporated case, in 1961, was not far removed in time from the entries in this litigation, which were in 1960 and 1961. So far as any time had elapsed, we think we may properly employ the presumption that a condition shown to exist at a particular time existed also for a reasonable period before and after that time. Volume II, Wigmore on Evidence (3d ed.), page 413 and ff. If we are mistaken in this, the Government, which apparently shared plaintiff's conception as to the relevancy of conditions at the time of trial, is in no position to complain.

The same considerations cannot be invoked to rescue the use testimony at the second trial. The court is satisfied from a careful reading of Witness Rosenfeld's testimony at both trials that in the incorporated case he disclosed all the uses he then knew about, and, it is

reasonable to suppose, all the uses there then were. They were in issue. Counsel knew the Government contended the merchandise was dedicated to but a single use. The new uses first mentioned at the second trial, e.g., Tambour doors, Hi-Fi grills, parquet flooring, were manifestly discovered by Mr. Rosenfeld after the first trial, and probably were, when discovered, actually new uses. At any rate, there is insufficient basis to apply Wigmore's presumption and without the presumption, the evidence becomes totally irrelevant.

However, thus limiting the use evidence, still it remained to be decided after importation how the merchandise was to be cut and finished and in just which application it would be employed, within the family of uses testified to without contradiction at the first trial. At that trial, Mr. Rosenfeld said he always processed the slats, and that the uses included "shades, roll-up shades, pull-down shades, room dividers, folding closet doors, shoji screens, portable folding screens, and roll-up type shades to keep rain and sun out of open porches." The Government counsel said the slats "have been dedicated to *a specific* use, namely, to be used as blinds *and* folding doors." [Emphasis ours.] Possibly a self-contradictory statement. The Government witness Hough used similar imported slats to make "folding slatted doors and screens and shades." The conflict, if any, was not material.

The testimony in the incorporated record, and the Government's admission show that when imported in 1960–61 the merchandise was not advanced to the point to take it out of the lumber category, considering the then available selection of end uses and the variety of operations to be performed to fit the articles for the uses selected for them after import. It was not, as imported, a part of any finished product, unassembled. Contrary expressions in the incorporated case grow out of the court's view, now no longer tenable, that molding is advance beyond planing. Furthermore, the evidence in the new case, even when limited to articles such as were produced in 1961, shows that cutting of slats required after importation was not limited, as the court previously supposed, to cutting off "about 1½ inches to give an even edge to the woven screens or door or blind produced." 51 Cust. Ct. 88, at page 95. On the contrary, slats for pull-down and pull-up blinds with the wood lying horizontal, were obviously too long and had to be cut other than by mere trimming. The supposed need for trimming only is now shown to apply only to the vertical applications, in doors and room dividers, where the full imported lengths of 80 and 96 inches were used. The papers show that all the imports were 80 and 96 inches except a very minor quantity, 74 inches. The court has no reason to doubt that the importer's practice of getting slats for blinds and other horizontal applications by cutting up 80- and 96-inch slats, was unchanged back to 1960, because in the incorporated case Mr.

Rosenfeld said he got smaller sizes when needed, by cutting the larger ones. The articles were always sanded and "tumbled" after importation, primed and painted according to the requirements of the product in which they were used. Only after this had been done were they parts unassembled. The name of the article when imported was "slats" but this denotes merely a kind of lumber, not a finished and useful article such as a "threshhold."

Thus in light of new decisions, not available when the one in the incorporated record was prepared, and in light of the relevant evidence in the new and incorporated records, and disregarding the large amount of evidence in both records which is irrelevant and immaterial, the merchandise was incorrectly classified under paragraph 412 and is designated *eo nomine* in paragraph 1803, as the protest claims.

This conclusion automatically disposes of plaintiff's claims for classification as an unenumerated manufactured article under paragraph 1558, which need not be considered further.

We hold, therefore, that the merchandise involved in this case is free of duty under paragraph 1803 of the Tariff Act of 1930, as lumber not further manufactured than planed, and tongued and grooved, and is subject to internal revenue tax under section 4551(1) of the Internal Revenue Code of 1954, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at $1.50 per 1,000 feet board measure as lumber planed or dressed on one or more sides. To that extent the protest is sustained. As to all other claims, it is overruled. Judgment will be rendered accordingly.