(C.D. 2461)

BORDER BROKERAGE CO. ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 15, 1964)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff* and *Morris Braverman*, trial attorneys), for the defendant.

Before OLIVER and WILSON, Judges

OLIVER, Chief Judge: The protests enumerated in schedule "A," hereto attached and made a part hereof, were consolidated for trial on motion of counsel for plaintiffs and without objection from Government counsel.

The merchandise involved herein consists of 1-piece and 2-piece cedar shorts or pattern stock, which were assessed with duty at the rate of 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Presidential proclamation carrying out the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, reported in T.D. 52373. Plaintiffs' principal claim is for entry free of duty under the provisions in paragraph 1803 (1) of the Tariff Act of 1930 for "sawed lumber and timber, not further manufactured than planed, and tongued and grooved; * * * not specially provided for," with consequent assessment of tax at the rate of 75 cents per thousand feet, board measure, under the provision in section 4551(1) of the Internal Revenue Code of 1954, as modified by the Presidential proclamation relating to the General Agreement on

Tariffs and Trade, T.D. 51802, for "Lumber, including sawed timber, rough, or planed or dressed on one or more sides * * * cedar."

In an alternative claim, made during the course of the trial by valid amendment to the protests, plaintiffs allege that the classification of the present merchandise "is a change of practice which was not brought about by the usual requirements under Customs Regulations, which require a 30-day notice." (R. 21–22.) To support the claim, plaintiffs called a customs examiner at the port of Seattle, but the witness' testimony falls far short of showing a uniform practice, as alleged by plaintiffs. Furthermore, the said alternative claim is neither mentioned, nor discussed in any way, in plaintiffs' brief. No further reference will be made thereto.

At the time of trial, counsel for the respective parties stipulated that the 1-piece pattern stock involved in this case is the same in all material respects as the 1-piece stock discussed in *B. A. McKenzie & Co., Inc.* v. *United States*, 39 Cust. Ct. 52, C.D. 1903, and that the 2-piece pattern stock involved in this case is the same in all material respects as the 2-piece stock, the subject of controversy in the cited case. The record in the *McKenzie* case, *supra*, was incorporated herein on motion by plaintiffs and without objection from defendant.

In the incorporated case, the merchandise in question was described as "2-piece stock, sawed lumber, planed, tongued, grooved and edge glued," and was classified under paragraph 412, as amended, *supra*, the same provision applied by the collector in the present case.

Imported in the same shipment, but not involved in the protest considered in the incorporated case, was certain merchandise described as "1-piece stock, sawed lumber not further advanced than planed, tongued and grooved," that was admitted free of duty under paragraph 1803(1), Tariff Act of 1930, *supra*, and assessed with tax at the rate of 75 cents per thousand feet, board measure, under the Internal Revenue Code, which it was claimed should also have been applied to the 2-piece stock.

Four witnesses testified in the incorporated case. Three appeared on behalf of plaintiff; one for defendant. Analysis of the evidence adduced therein is set forth in the court's decision, C.D. 1903, *supra*, as follows:

The evidence establishes that both the 1-piece stock and the 2-piece stock are ultimately used for the same purpose—in the manufacture of sides of drawers for furniture. As imported, they are each manufactured to the same extent with that end in view, the only real difference between them being that, in the case of the 1-piece stock, the wood was originally sufficiently wide for the width dimension desired, while, in the case of the 2-piece stock, the wood originally was not sufficiently wide, and the two pieces were joined together by what is known as the Linderman joint (a type of dovetail joint, running lengthwise) and glued under pressure so as to provide the width desired.

The merchandise at bar was made from reject cedar bevel siding which, for one reason or another, was unsuitable for siding purposes and which was resawn so as to obtain the desired thickness.

The evidence also shows that, before importation, aside from the operations necessary to joining the two pieces, which make up plaintiff's illustrative exhibit 2, by means of the Linderman joint and gluing under pressure, both the 1-piece stock and the 2-piece stock had been planed on both surfaces, "bullnosed" on the top edge and "eased" on the bottom edge (both apparently types of planing), and each had a groove above three-sixteenths of an inch wide and three-sixteenths of an inch deep, cut lengthwise about three-fourths of an inch from the bottom. The effect on the classification of the merchandise of the bullnosing, easing, and grooving is apparently not in dispute and is apparently not considered by the Government as processes further manufacturing the merchandise than the planed, tongued, or grooved state, permitted by paragraph 1803(1), *supra.*

The record shows that a considerable amount of work remains to be done to the merchandise, after importation, in order to fit it for its ultimate use in the manufacture of drawers. It appears that it is sometimes recut to width and regrooved and, in any event, it is cut to length, chamfered, dovetailed, sanded, and beveled.

Sustaining plaintiff's claim on the foregoing established facts in the *McKenzie* case, *supra*, the court applied the principle expressed in *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T.D. 35926, and stated as follows:

* * * It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article from its native condition and to bring it into a condition that it may be imported, *without affecting its per se character*, is not regarded either as a manufacturing process or as a process advancing it in value or condition. [Italics added.] [Italics quoted.]

and then concluded as follows:

Applying the foregoing rule to the merchandise at bar, it will be seen that the processes of effecting the Linderman joint and gluing under pressure made two narrow pieces of wood into one wide piece of wood. The merchandise was merely wood material, lumber, before the processes were applied thereto, and it was wood material, lumber, when it emerged from those processes. Its *per se* character as lumber was not changed at all.

The instant case comes before us through the limitation placed upon the decision in the *McKenzie* case, *supra*, by the Bureau of Customs, in its directive to all customs officers (93 Treas. Dec. 204, T.D. 54595), which accepted the principle announced in the cited case that—

* * * wood material, lumber, subjected to the processes of Linderman jointing and gluing under pressure, making one wider piece from two narrower pieces, remains lumber within the purview of paragraph 1803 of the tariff act, or under paragraphs 401 or 404, as applicable, if not advanced beyond lumber.

and then stated as follows:

* * * The principle of that decision, however, will be applied to glued stock, including jointed and glued stock whether joined by a Linderman joint or

similar process, of a length, width, and thickness which is recognized in the trade as lumber if of one-piece material. This principle will apply whether the stock is edge-glued, end-glued, both edge-glued and end-glued, or jointed and glued.

Consistent with the attitude of the Bureau of Customs as hereinabove set forth, Government counsel, in his brief, states as follows:

The principle of law announced in C.D. 1903, *supra*, that wood material, lumber, subjected to the processes of Linderman jointing and gluing under pressure, making one wider piece from two narrower pieces, remains lumber within the purview of paragraph 1803 if not advanced further beyond the lumber state is acceptable to the Government and is not disputed. However, it is urged that the material here has been further advanced beyond the lumber state by bullnosing, easing and grooving.

It follows, from the foregoing review of previous considerations relating to the classification of merchandise, such as that involved herein, that the sole question now before us is whether bullnosing, easing, and grooving the present merchandise, prior to importation, "further manufactured" the imported commodity beyond the condition of wood material, lumber, that is allowed free entry under paragraph 1803 (1), *supra*.

Testimony, adduced by both parties in the incorporated record, shows that bullnosing, easing, and grooving comprise a multiple operation that is done in a single machine, equipped with cutting knives of different shapes and susceptible of various adjustments. For a description of the multiple process, we quote from the testimony of the purchasing agent of the importer, who appeared on behalf of plaintiff in the earlier case and who had observed processing of the lumber in the Canadian mill from which the pattern stock in question was imported. The pertinent testimony appears in the record as follows (R. 8–9, protest 272595–K):

Q. All right, describe what you have seen, which you call the easing operation?—A. The easing operation is one where the board is passed through knives traveling at high-speed, which removes from the corner of the stock a slight amount of wood and gives the appearance as it is passing from the machine as being slightly rounded or eased on the edges.

Q. As shown by Plaintiff's Illustrative Exhibit #1?—A. Yes.

Q. Have you seen the bull-nosing operation?—A. Yes.

Q. Would you please describe the bull-nosing operation, to accomplish the result as shown on the top of Plaintiff's Exhibit #1?—A. The bull-nosing operation is the passing through of this stock, plaintiff's Exhibit #1, through a machine where knives ground to a greater radius to give a greater degree of curvature to the top.

Q. May I call your attention to one side of Plaintiff's Exhibit #1?—A. On that side, there is a small groove running the length of the piece.

Q. Have you seen that operation before?—A. Yes.

Q. Would you please describe it?—A. That small groove is put in the piece by a small knife running the length of the board as the board travels through the machine.

Although the above-quoted testimony refers specifically to the 1-piece stock (plaintiff's illustrative exhibit 1, protest 272595–K), the record in the incorporated case shows that the same explanation applies to the 2-piece stock (plaintiff's illustrative exhibit 2, protest 272595–K).

Bullnosing, easing, and grooving the lumber, at the Canadian mill, gives the material a smooth surface and brings it to the desired thickness.

At the hearing of the present case, defendant introduced the testimony of the plant manager and superintendent of a furniture manufacturing company in Seattle. He testified concerning the use of pattern stock, such as the merchandise under consideration, in drawer construction employed by his company. In this connection, he stated that his company has never manufactured drawer sides but purchased them locally, in Seattle, that they were ordered "equalized and to size," and that they merely have to be glued and stapled to the sides to complete the drawer. On cross-examination, he stated that there are many methods of drawer construction, that his company never employed the method outlined in the incorporated record with the use of the pattern stock in question, and that such construction, with the present merchandise, "goes in the real high-priced furniture." (R. 20.)

The witness' limited experience with drawer construction, confined, as it is, to the method followed by his company, leaves his testimony insufficient to disturb the factual situation established by the evidence introduced in the incorporated record, heretofore set forth.

The case of *United States* v. *Myers & Co. et al.*, 5 Ct. Cust. Appls. 541, T.D. 35179, is pertinent. Although the cited case arose under the Tariff Act of 1913, the statutory language involved therein was the same as that under which plaintiff claims classification for the present merchandise. There, as here, the question was whether lumber, which had been subjected to certain processing at the time of its importation, was thereby removed from the provision for lumber, not further manufactured than "planed, and tongued and grooved." Discussing the statutory terms in controversy, the appellate court stated as follows:

The Government contends that the addition of the words "and tongued and grooved" in the classification implies that Congress had not used the term "planed" in the generical sense claimed by the importers, for the descriptive words "tongued and grooved" would have been wholly unnecessary if the preceding term "planed" already included that process. The Government therefore claims a more restricted interpretation, such as would not include such processes as beading or tonguing and grooving, within the meaning of the word "planed."

In answer, however, it may be said that Congress used the terms "and tongued and grooved" in the classification as words of specification and not as words of extension. It must be conceded that this is not uncommon in tariff legislation. This construction is favored by the fact that one purpose of the act was to reduce tariff duties, and that such beaded boards as those now in question are essentially similar in character to ordinary Novelty siding boards, which are concededly covered by the disputed classification. They are alike common materials for plain building purposes, and they are produced by the same essential operation. It does not seem reasonable that the use of a beading knife in the planing process should alone deprive the boards in question of free entry under paragraph 647 and make them dutiable as manufactures of wood not specially provided for under paragraph 176. * * * The beading of the boards seems to add nothing to their cost, nor does it give them a new name, character, or use. They are simply lumber which has been planed in a well-known manner and has not been advanced beyond the condition of planed boards.

The *Myers* case, with its broad interpretation of the terms "planing" and "planed" to include not only the production of flat or smooth surfaces but also the production of shaped surfaces, was cited with approval in the recent case of *Best Moulding Corporation* v. *United States* (*Brown, Alcantar & Brown, Inc., Party in Interest*), 49 Cust. Ct. 102, C.D. 2366, affirmed in *Same* v. *Same*, 51 CCPA 7, C.A.D. 829, which emphasized the consistent and continued interpretation of the terms over the course of the passage of successive tariff acts without material change by the Congress in the language involved, which implies legislative approval of judicial interpretation.

The cited judicial pronouncements, with their broad and liberal interpretation of the tariff term, "planed," are consistent with definitions in recognized lexicographic authorities. The Century Dictionary includes an all-comprehensive definition of the word, "plane," as follows:

Plane 1. A tool for paring, smoothing, truing, and finishing woodwork. * * * Planes are made in a great variety of shapes and sizes, and range from 1 to 72 inches in length. Nearly all are distinguished by names having reference to the particular kind of work for which they are designed, as the *edge-plane*, *molding-plane*, and *smoothing-plane*.

Knight's American Mechanical Dictionary also contains a definition, indicative of the wide scope of the word, "plane," reading as follows:

Plane 1. (*Woodworking.*) A carpenter's cutting and surface-smoothing tool, of which there are many varieties, called from some peculiarity of construction or purpose.

Funk & Wagnalls New Standard Dictionary, following the general definition of the noun, "plane," lists various types or kinds of planes, including grooving plane, "having a bit for making channels in wood," and bullnosing plane, "having its bit at the front end in order to reach into corners," both of which types of planes can be associated

with the multiple operation performed on the pattern stock involved herein.

In the light of the cited judicial authorities, coupled with the dictionary definitions hereinabove identified, we hold that bullnosing, easing, and grooving the pattern stock, prior to importation, were nothing more than a combined planing process, that the processing did not change the *per se* character of the lumber, and that the commodity was merely wood material, lumber, before the multiple operation was applied thereto, and it was wood material, lumber, when it emerged therefrom.

Consideration has been given to all of the cases and authoritative references mentioned in the briefs filed by counsel for the respective parties. Our discussion herein refers only to such authorities considered necessary to support the reasoning followed and the conclusion reached.

On the basis of the combined records before us and for all of the reasons stated herein, as well as those set forth in the *McKenzie* case, *supra*, we hold the 1-piece stock and the 2-piece stock involved herein to be material, lumber, not further manufactured than sawing, planing, and tonguing and grooving, designed to be used and fit only for use in the manufacture of drawer sides; that the present merchandise, in its condition as imported, was not drawer sides but required further manufacturing effort to make it such; and that, not being otherwise specially provided for, it is properly classifiable under paragraph 1803(1), *supra*, as claimed. The conclusion follows the collector's classification of the 1-piece stock in protest 272595–K, which was involved in the *McKenzie* case, *supra*, and adheres to our decision with respect to the 2-piece stock, the merchandise in controversy in the incorporated case.

Judgment will issue sustaining the protests claiming free entry under said paragraph 1803(1), with consequent assessment of tax or duty under the provisions of section 4551(1) of the Internal Revenue Code of 1954, as modified, *supra*.