**D. B. FRAMPTON & COMPANY and Dorf International, Inc.,**

v.

**UNITED STATES.**

C.D. 3243;  Protest No. 64/10982–7911.

United States Customs Court,
First Division.

Jan. 4, 1968.

John C. Ray, Detroit, Mich., for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Richard J. Kaplan, Glenn E. Harris, and Steven R. Sosnov, trial attys., New York City), for defendant.

Before WATSON and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case, described on the invoice as hard maple flooring, was imported from Canada and entered at the port of Detroit on November 21, 1963. It was assessed with duty at 16⅔ per centum ad valorem under item 202.60 of the Tariff Schedules of the United States, as wood flooring, other. It is claimed to be dutiable at 4 per centum ad valorem under item 202.57, as hardwood flooring in strips and planks.

The pertinent provisions of the Tariff Schedules of the United States are as follows:

Wood flooring, whether in strips, planks, blocks, assembled sections or units, or other forms, and whether or not drilled or treated (except softwood flooring classifiable as lumber):

| | | |
|---|---|---|
| 202.57 | Hardwood flooring in strips and planks, whether or not drilled or treated · · · · · · · · | 4% ad val. |
| 202.60 | Other · · · · · · · · · · · · | 16⅔ ad val. |

The merchandise is marketed as "Doweloc" and is described on the invoice as hard maple flooring, 2 inches thick, in widths of 12 inches or 3⁷⁄₁₆ inches, in varying lengths from 10 feet 3½ inches to 22 feet 10 inches. That it is hardwood flooring is not disputed. The issue is whether it is in strips and planks.

The method of manufacture was described by John W. Webster, vice president and general manager of the Doweloc Division of D. B. Frampton & Company, and also appears in the sales brochures, exhibits A, B, C, and D. According to this evidence, common boards are fed through a gang of ripsaws, producing 1 inch, 1½ inch, and 2 inch strips. The strips are then precision machined to exact dimensions and two tongues are formed on one face and two matching grooves on the opposite face. The strips are fitted together and holes drilled through them laterally. Aluminum or steel dowels are pushed through by a hydraulic ram at intervals of not less than one every foot. When the strips are put together, the merchandise comes out as one long, continuous piece which is cut to the lengths desired by the customer. Ninety percent of the units are 10 feet long but they can be produced in varying lengths. The widths are determined by the number of strips used, 14 strips making a 1 foot wide unit.

A representative sample of the merchandise was received in evidence as exhibit 2 and a small cross section as exhibit 1. A sample of a component strip was received in evidence as exhibit 8. It is 24 inches long, 2¼ inches wide, and ⅝ inches thick. Exhibit 2 is made up of 37 strips in widths of 14 strips. The strips are joined or fastened by dowels laterally but are butted lengthwise.

There was also received in evidence as exhibit 3, a piece of hard maple in about the dimensions of exhibit 2. Mr. Webster testified that it was a form of lumber, a plank rather than a board, and could be used as a flooring plank or for other purposes.

Doweloc is described variously in the sales brochures (exhibits A, B, C, and D) as "prefabricated structural hardwood edge-grain lumber" as "made of wood components reinforced with steel dowels" or as "a shop fabricated edge grain laminated plank." Exhibit D states:

DOWELOC is a prefabricated, structural hardwood, edge grain planking custom fitted to the job. It is built up of an assembly of tongued and grooved edge grain components held together by spiral steel dowels.

According to Mr. Webster, 90 percent of the imported merchandise are used for railroad box car flooring and the balance in gymnasiums, industrial floors, docks, machine shops, and a few residences.

Mr. B. W. Frampton, president of D. B. Frampton & Company, testified that it is practically all—97 to 97½ percent —sold to builders of freight cars and to 90 railroads throughout the United States. In making box car flooring the Doweloc units are laid side by side so that the tongue and groove fit. Usually fifty units are used in a 50-foot box car. Sometimes the planking is sold in assembled sections, fastened three or four together to make a large section, to permit faster installation in a box car. This is not done often because it is too cumbersome and heavy. Strips, such as exhibit 8, may be used to widen a plank or fill out a floor.

Mr. Webster stated that exhibit 2 is plank flooring and is normally referred to as such. While it is sometimes called a panel to put a little fluff or glamor into advertising, it is not a panel, which in his view is 4 by 8 finished plywood or veneer.

The witness said a plank was a piece of wood thicker than 1 inch and usually quite wide. He was familiar with plank flooring, such as Doweloc, and similar plank flooring made by other companies which was glued rather than doweled. He also knew of a plank flooring made of wide board with artificial or fake plugs in the end to make it look like the old peg flooring of early colonial days. Such flooring was formerly made of boards 12,

14, 16, and 20 inches wide, but today it is usually made of narrower pieces glued together to make wider boards.

Mr. Webster testified that exhibit 2 was not block flooring, which he described as a thin square under a half inch thick, sometimes prefinished, used in homes, apartments, and high rise buildings. Samples of block flooring about 9 inches square were received in evidence as exhibits 4 and 5. The witness also said that exhibit 2 is not a type or form of parquet flooring (a sample of which was received in evidence as exhibit 6) nor an assembled section, or unit, or other form of maple flooring. A section or unit, in his opinion, would be many pieces put together to form a section or unit such as prefabricators do to form a complete floor. He also said that Doweloc was not a preassembled section of strip flooring, explaining that strip flooring is thin and not structurally strong and has to be attached and put over a structural assembly or panel such as plywood or concrete. If it were nailed to a 4 by 8 piece of plywood, a preassembled section or unit would be obtained, ready to drop into a predesignated place in the building.

Plaintiffs' second witness was Carl Allison Rishell, a consultant on all kinds of wood products, who had had varied experience in the field. He held a B.S. degree in forestry specializing in wood utilization. He had been employed by the W. M. Ritter Lumber Company, which in 1923 was the largest hardwood lumber producer in the world. He had had charge of all of the company's flooring production in five plants in five different states. He had also served as director of the hardwood division and as assistant director of technical affairs for the National Lumber Manufacturers Association. During World War II he was employed by the Government to make recommendations on specifications involving wood use by the armed forces. Subsequently he had had charge of research of the American Forest Products Industries, the National Lumber Manufacturers Association, and the Timber Engineering Company. He is now consultant to Smithsonian Institute, the Timber Engineering Company, and the National Lumber Manufacturers Association. He is a member of various professional societies, has written papers on hardwood, and has visited practically all of the major hardwood flooring operations in the United States and about 100 plants abroad.

Mr. Rishell testified that he was familiar with all types of hardwood flooring through his experience in production or research and testing. He had tested the product represented by exhibits 1 and 2 in the laboratory of the Timber Engineering Company. He said it was a maple flooring plank, a laminated plank made of components cut out of a maple tree. The lumber was cut from maple trees, manufactured into strips, molded into the form desired, and put together with dowels to form exhibit 2. The witness compared exhibit 3, which he said was square edged, but could be tongued and grooved, with exhibit 2 which was tongued and grooved, and stated:

> One is a solid plank, the other is a laminated plank. By solid plank, the components are put together by nature and held together by nature's forces. Both planks have components. In the solid plank it is made up of cells and fibers and the adhesive used we call lignin. In the other plank it is made of the strips just described held together by dowels.

Mr. Rishell testified that he had seen planking such as exhibit 3 used as flooring but not much at the present time because of the cost, due to the fact that there were not enough maple trees of that size to supply all the needs of the United States. However, he said that exhibit 2 was within the normal diameter of a maple tree; that one could cut a solid plank of that size.

Mr. Rishell testified that exhibit 2 was not block flooring as such flooring is composed of square or rectangular pieces of veneers of plywood or solid pieces of wood. In his opinion, exhibit 2 was not

an assembled section, or unit, or other form of wood flooring, as a section would be 2, 3, or more of the planks fastened together on a backing or held together in some other way. It was not a form of parquet or patterned flooring, nor a pre-assembled section of strip flooring. He said that the latter consists of a considerable number of pieces, or units, or strips, which have been put up on a piece of backing and which are used in a large sheet and quite often used by pre-fabricating manufacturers. The dimensions of the sections would normally be 4 by 8. They could be laid on a heavy plywood sheet of a section of flooring having a subfloor and joists underneath.

Mr. Hugh W. Harris, customs broker, testified that he had prepared entries for merchandise such as exhibit 2 for two or three years prior to September 1, 1963, and that they had been assessed with duty at 4 percent under paragraph 402 (of the Tariff Act of 1930, as amended) as flooring.

Plaintiffs next called Fred Peronto, who had recently retired as executive vice chairman of the Mechanical Division of the Association of American Railroads (hereinafter called AAR). His experience included 21 years with the Chicago and Northwestern Railroad in the Mechanical Department, and over 20 years in the Mechanical Division of AAR. He had been in charge of building freight and passenger cars of various types, had supervised the inspection of cars received from other railroads to determine whether they met all the requirements of the Interchange rules, and had supervised the activities of various committees of the Mechanical Inspection Department of AAR. He said that, among other things, AAR sets up specifications and standards for railroad equipment, makes laboratory tests of materials submitted for approval, and checks actual performance.

According to the witness, Doweloc was submitted to his office during the latter part of 1957 as an item for use as plank flooring in freight cars. It was subjected to extensive testing and received AAR approval in January 1958. Thereafter it was observed in actual performance in freight cars many times. Mr. Peronto testified that, in the railroad industry, it is known as plank flooring. He also said that exhibit 3 would be called plank flooring if used on a flat car or a closed type car, but that it might also be used some other place on a railroad.

The witness stated that, in addition to conventional floor planks, there are 8 or 9 other flooring planks somewhat like Doweloc which are termed plank flooring in the railroad industry. He said that exhibit 3 is a plank which could be used as plank flooring and for other purposes.

Defendant called Robert J. Blanke, who had been sales manager of Hardwood Corporation of America for 3 years, and had previously had his own wholesale lumber business. He said that the Hardwood Corporation manufactures various lumber products including laminated wood flooring known as Woodlok. A sample of the product and a sales brochure were received in evidence as exhibits F and G. The witness testified that exhibit F is made out of maple by ripping rough lumber, planing to exact thickness, gluing the edges, and running the pieces through the electronic gluing machine. What comes out is an assembled plank which may be 3 feet or 4 feet wide, depending on the size of the press. Then it is ripped into the desired width of the plank, normally 12 inches. Woodlok can be manufactured in any length, but it is normally made for the truck flooring industry in lengths of from 20 to 40 feet. His firm also makes a thicker plank which is used primarily for the railroad industry but is also used for squash courts.

When selling the product it is called Woodlok, but if a customer is not familiar with it, it is explained that it is a laminated section of individual components. The terms "laminated plank", "laminated flooring", "assembled flooring", and "assembled plank" are used. If the customer is familiar with the product, the term "plank" alone may be used. In making quotations, the company specifies whether it is referring to a lamin-

ated plank or a solid plank. It would not fill an order for plank flooring without a modifying word with a product like exhibit F. The witness stated that a plank "in lumber" is a solid board and that, in his understanding, the people who buy and sell lumber, so use the term.

The witness does not sell strip flooring but is familiar with it. He said that the components of exhibits 2 and F are not strip flooring. He is also familiar with flooring in plank form and block form, but not with hardwood plank flooring. He said that exhibits 4 and 5 are laminated block flooring and that exhibit 6 is another type of block flooring, laminated with adhesive but edgewise.

To him, exhibit 3 was a plank of lumber which could be used for flooring but for other purposes also. It is just plank lumber and has the characteristics of a plank. Exhibit 2 is a manufactured plank assembled from individual components, but it is in plank form. He had seen it used in railroad cars as flooring, and said, in the broader sense of the term, it was a floor plank. His product, Woodlok, is advertised as laminated plank floor and is an assembly of components to form a board. In his view, the dictionary definition of plank met the specifications of a laminated plank, and he concluded that, since exhibit 2 is a laminated plank used as a floor plank, it is a floor plank. The word "plank" itself does not connote an article which is tongued and grooved.

Defendant's second witness was Richard L. Burkhart, wood technologist and production manager of plank flooring for Anderson-Tully Company, Memphis, Tennessee. He had been in the wood business since 1946 and from 1940–46 had done wood research for the Army. He holds a forestry degree from Purdue University and a master's degree in Wood Utilization from the University of Michigan. The company he is presently associated with makes various wood products including laminated flooring and plank flooring. Its laminated flooring is made by gluing individual pieces of wood together into panels approxi-

mately 28 inches wide from which any desired width can be cut. It can be cut down to a laminated plank 14 inches or 16 inches wide. Additional pieces can be added to make a given thickness. The product produced by the latter process could be called block flooring.

In his experience in the lumber industry, the term "plank" means a broad board, usually more than 1 inch thick, laid with its wide dimension horizontal and used as a bearing surface. He said that the word "plank" by itself denotes or connotes one board and not an assembled or laminated unit.

His firm makes a laminated wood product similar to exhibit F but using wood other than maple, and sells it as laminated truck flooring. His firm also makes plank flooring from one piece of lumber, finger jointed or prong jointed to make a continuous board the desired length for the final product.

His firm received some orders that can be filled interchangeably with laminated or with plank flooring but other orders must be either plank or laminated. His product is composed of individual strips which could be sold as strip flooring.

He testified that exhibit 4 was laminated block flooring and that there were a number of things that could be considered block flooring. It may be 2 inches thick, 4 inches wide, and 6 inches long. It may be 30 inches wide and 30 inches long and 5 inches thick. It may be a series of strips that are glued to a lower base forming a block of a given dimension.

The witness stated that to him wood strip flooring is a square edged flooring approximately $3/8$ of an inch thick and $5/8$ of an inch wide. The individual pieces of exhibit F could be construed as pieces of strip flooring. He also mentioned strip flooring $3/8$ and $7/8$ of an inch wide and $3/8$ to $1/2$ of an inch thick.

The plank flooring he produces consists of single boards that are so made that the user can fasten them end to end on the job to make the desired length.

To his thinking exhibit F is a laminated panel, but it could be called a laminated plank or a laminated board. Exhibit 2 is not a laminated product as it has no adhesive. It could be called a panel or flooring or assembled flooring or assembled plank flooring.

In rebuttal, plaintiffs called Gordon R. Connor, president and general manager of the Connor Lumber & Land Company, which makes hardwood, hardwood flooring, plywood and veneer and prefinished kitchen cabinets. The witness had been with the company 18 years and had previously managed a sawmill and logging operations and had sold lumber and flooring. He testified that exhibit 8 is a piece of hard maple, tongued and grooved on the face side, with the same milling as in the plank, exhibit 2. He said that exhibit 2 was plank flooring and not an assembled section of flooring because the component parts could not possibly be used for flooring.

He testified also that exhibit F is plank flooring and that the individual components of exhibit F are strips of wood but that they are not strip flooring.

From the evidence presented, it is clear that Doweloc is not a conventional plank consisting of one piece of wood but is made up of tongued and grooved wooden strips fastened by dowels to make an item which resembles a conventional plank in general appearance and is used for the same purpose for which a conventional plank cut to the same dimensions tongued and grooved is used, flooring. Doweloc and similar merchandise made by gluing strips together were called by the witnesses "flooring planks", "maple flooring planks", "maple plank flooring", "plank flooring", "laminated planks", "assembled planks", "laminated flooring", and "assembled flooring."

The question is whether an assembled article in plank form is classifiable under the provision in item 202.57 for hardwood flooring in strips and planks, whether or not drilled or treated, or whether merchandise must consist of a plank made of a single piece of wood in order to be so classified.

The defendant, in urging the latter view, relies heavily on dictionary definitions, such as the following:

1. MATERIALS HANDBOOK (8th ed.1956), p. 884:

* * *. Plank is a *piece cut* to rectangular section 11 in. wide; * * * [Emphasis added.]

2. DICTIONARY OF TECHNICAL TERMS (8th ed.1957), p. 302:

*plank* (Woodwkg.) A wide *piece* of *sawed* timber thicker than a board, usually 1½ to 6 in. thick and 6 in. or more wide [Emphasis added.]

3. CHAMBER'S TECHNICAL DICTIONARY (Revised ed.1953), p. 649:

*plank* (Timber). A *piece* of timber of thickness 2–6 in. and of width from 11 in. upwards. [Emphasis added.]

and at p. 851:

*timber*. Felled trees or logs suitable for conversion by sawing or otherwise.

4. AUDELS MECHANICAL DICTIONARY (1942), p. 405:

Plank,—A broad *piece* of *sawed* timber, differing from a board only in being thicker. [Emphasis added.]

5. THE WINSTON DICTIONARY (1957), p. 740:

*plank* n. 1, a long broad *piece* of *sawed* timber thicker than a board; * * * [Emphasis added.]

6. MARCH'S THESAURUS DICTIONARY (1958), p. 781:

*plank*. A thick board.

7. STORMONTH ENGLISH DICTIONARY (1885) p. 749:

*plank,* n. a flat *piece* of *sawn* timber of some length, differing from board in being thicker. * * * [Emphasis added.]

8. A DICTIONARY OF CONTEMPORARY AMERICAN USAGE (1957), p. 371:

*plank,* basically, means a long flat piece of timber, thicker than a board. More loosely, it means something to stand on or cling to for support

(*A floating plank saved him from drowning*). \* \* \*

9. HANDBOOK 72, UNITED STATES DEPARTMENT OF AGRICULTURE (1955), p. 487:

*Plank*.—A broad board, usually, more than 1 inch thick, laid with its wide dimension horizontal and used as a bearing surface.

and at p. 479:

*Boards*.—(*See* Lumber.)

*Lumber*.—The product of the saw and planing mill not further manufactured than by sawing, resawing, passing lengthwise through a standard planing machine, crosscutting to length, and matching.

*Boards*.—Yard lumber less than 2 inches thick and 1 or more inches wide.

*Yard Lumber*.—Lumber of all sizes and patterns that is intended for general building purposes. \* \* \*

▆▆ In the instant case, we are not dealing with the term "plank" standing alone but with a provision for hardwood flooring in strips and planks, whether or not treated or drilled. We are to determine what Congress intended by the provision as a whole. In making this determination, it is pertinent to consider the history of the provision and related provisions in this and previous tariff acts.

At the time the Tariff Act of 1930 was being prepared, this court handed down a decision involving thin, narrow strips of Japanese white oak, Mitsui & Co. et al. v. United States, 53 Treas.Dec. 1060, Abstract 6272, which was later affirmed by the Court of Customs and Patent Appeals, sub nom. United States v. Mitsui & Co., et al, 17 CCPA 67, T.D. 43359. The merchandise, invoiced as "oak flooring", was held free of duty under paragraph 1700, Tariff Act of 1922, as lumber not further manufactured than sawed, planed, and tongued and grooved. The court found that that provision covered the merchandise more specifically than the one in paragraph 403 for wood unmanufactured, and that, since it had been tongued and grooved, it did not come within the provision in said paragraph 403 for "other forms not further manufactured than sawed."

The abstract decision was referred to in the Memorandum of Court Decisions Affecting Tariff Act of 1922, page 25, and in the Supplement to Tariff Information on Items in Tariff Bill of 1930 (H.R.2667) Subject to Conference, page 260. Congress, in the Tariff Act of 1930, added "flooring" to paragraph 404 (the successor to paragraph 403 of the 1922 Act), evidently intending that flooring, such as the Japanese white oak flooring involved in the *Mitsui* case, should be dutiable under that provision.

Congress also provided separately for maple, birch, and beech flooring in paragraph 402, at the urging of the American manufacturers. (Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, Second Session, vol. XV, schedule 15, pp. 9640–9652; Hearings before a Subcommittee of the Committee on Finance, United States Senate, Seventy-First Congress, First Session, on H.R. 2667, vol. IV, schedule 4, pp. 156–220).

In a brief filed in connection with said hearings, the American manufacturers pointed out that hardwood flooring was a completely manufactured product, surfaced on one or two sides, tongued and grooved on the edges, and/or surfaced on both edges or grooved on the ends.

Thereafter, in John V. Carr & Son, Inc. v. United States, 47 Cust.Ct. 91, C.D. 2285, certain maple lumber, classified by the collector as maple flooring under paragraph 402 of the Tariff Act of 1930, as modified, was held entitled to free entry under paragraph 1803 on the ground that it did not correspond to the common and commercial meaning of the term "maple flooring". Four witnesses testified that the term "maple flooring" had a much more restricted meaning than the term "flooring" and referred to wood which had been tongued

and grooved with precision, off center of the narrower dimensions, end-matched, and flat-grained.

See also Summaries of Tariff Information, 1948, volume 4, page 17, and Tariff Classification Study of November 15, 1960, schedule 2, pages 21–22. In the latter it is stated:

> * * * Hardwood flooring in strips and planks consists of lumber milled to accurate dimensions, either tongued and grooved or with square edges and ends. This flooring is usually planed, and may be sanded or otherwise surface-finished, hollow-backed, or drilled with holes for nails. Usually strips range in thickness from 5/16 to 25/32 inch and in width from 1½ to 1¾ inches. Plank flooring is thicker and wider, and usually has a squared edge.

It thus appears that, when the term "plank" is used in connection with hardwood flooring, it is not a mere material, or a plank such as exhibit 3 in this case, but an article which has been manufactured to certain dimensions, planed, tongued and grooved, and end-matched. Item 202.57 itself provided that it may be treated or drilled. The merchandise involved here meets these requirements.

Does the fact that it is not a single piece of wood but has been assembled from several pieces take it out of the provision for hardwood flooring in strips and planks, whether or not drilled or treated?

Pertinent to this issue is another line of cases involving so-called glued-up lumber.

In B. A. McKenzie & Co., Inc. v. United States, 39 Cust.Ct. 52, C.D. 1903, the merchandise was described as "2-piece stock, sawed lumber, planed, tongued, grooved and edge glued." It was assessed with duty under paragraph 412 of the Tariff Act of 1930 as a manufacture of wood and was claimed to be free of duty under paragraph 1803(1) as "sawed lumber and timber, not further manufactured than planed, and tongued and grooved," and subject to internal revenue tax under section 4551(1) Inter-

nal Revenue Code of 1954 as "Lumber, including sawed timber, rough or planed or dressed on one or more sides."

Imported at the same time and covered by the same entry, but not involved in the protest, was merchandise described as "1-piece stock, sawed lumber not further advanced than planed, tongued and grooved." The evidence established that both the 1-piece stock and the 2-piece stock were ultimately used for the same purpose in the manufacture of sides of drawers. The only real difference between them was that the wood in the 1-piece stock was originally sufficiently wide for the width dimension desired while, in the case of the 2-piece stock, two pieces had to be joined together to provide the width desired.

The court held that the processes of joining the pieces and gluing under pressure made two narrower pieces of wood into one piece of wood and that the merchandise was merely wood material, lumber, before the processes were applied and that it was wood material, lumber, thereafter. The court held, therefore, that the processes did not constitute manufacturing, removing the merchandise from the purview of paragraph 1803(1). It noted that the shape, condition, and dimensions in which the merchandise was imported were the result of sawing, planing, tonguing and grooving, that is to say, operations which were within the purview of paragraph 1803(1).

See also Border Brokerage Co. et. al. v. United States, 52 Cust.Ct. 204, C.D. 2461.

In a subsequent case, Clarence S. Holmes, a/c Best Products Mfg. Co. v. United States, 44 Cust.Ct. 111, C.D. 2161, appeal dismissed 48 CCPA 169, it was held that 2-piece, edge-glued material, in widths over 9 inches, was not classifiable as lumber because maple lumber was not produced by processes of sawing, planing, tonguing and grooving in widths in excess of 9 inches. See also P. W. Drittler v. United States, 52 Cust.Ct. 227, Abstract 68213.

The Tariff Schedules of the United States has recognized that edge-glued or end-glued wood in certain dimensions falls within the definition of lumber. See headnote 2(a), subpart B of part 1 of schedule 2. This view was adopted in spite of the fact that at the hearings a representative of the National Lumber Manufacturers Association claimed that lumber made by gluing lumber pieces together or laminated lumber should not be included in the definition of lumber. (Tariff Classification Study, schedule 2, p. 250).

According to the testimony, the merchandise here falls within the dimensions of a single piece of lumber cut from a maple tree, and, because of a shortage of wood in those dimensions, takes the place of a conventional plank. There seems no more reason to exclude an assembled or laminated plank from coverage by the provision for flooring in strips and planks than there was for excluding glued-up lumber from classification as lumber. In this connection, it is significant that the definitions in Handbook 72, U. S. Department of Agriculture (1955) pages 487 and 479, quoted above, define a board as yard lumber and a plank as a board.

The evidence herein establishes that the imported merchandise is used almost exclusively as railroad car flooring and that it is known in the railroad industry as plank flooring. There is also considerable evidence by well-qualified witnesses that this type of merchandise is known generally as plank flooring or flooring planks. The witnesses agreed and the Government has conceded that the merchandise is in plank form. Any semantic distinction which may exist between the terms "flooring in planks", "plank flooring", and "flooring in plank form" is not one that is made commercially and is not to be attributed to Congress unless clearly manifested. In fact, the Tariff Classification Study uses the term "plank flooring" as well as the term "flooring in strips and planks".

Congress knew that hardwood flooring was more than mere material, whether in strips or planks, but was manufactured to accurate dimensions, tongued and grooved, and end-matched. It also knew that all maple, birch, and beech flooring was dutiable at the reduced rate of 4 per centum ad valorem under paragraph 402, Tariff Act of 1930, as modified. In the Tariff Classification Study, which was before it when the Tariff Schedules of the United States was enacted, it is stated (Schedule 2, pp. 21–22):

> * * * Item 202.57 applies to hardwood flooring in strips or planks presently dutiable under paragraphs 402, 404, and 1803(1) and subject to import taxes under IRC section 4551 (1). The rates range between $1.50 per 1,000 feet board measure, to 7.5 percent ad valorem plus $1.50 per 1,000 feet, board measure. Approximately 95 percent of all imports consist of flooring of beech, birch, or maple dutiable under paragraph 402 at the rate of 4 percent ad valorem, which is the rate proposed for item 202.57. This proposal would greatly simplify the existing rate structure for hardwood flooring in strips and planks with only small increases and reductions in the rates on such flooring of a few species which account for only a small part of imports. * * *

This is an indication that item 202.57 was intended to cover a few species of hardwood in addition to maple, birch, and beech flooring, but that the existing 4 percent rate was to continue to apply to hardwood flooring in strips and planks. In this connection, it should be borne in mind that the separate strips, such as exhibit 8, which were imported together with the merchandise before us, were assessed with duty at the 4 percent rate and that the instant merchandise is composed of such strips.

■■ It is well settled that, where an article is provided for *eo nomine* without limitation, or a shown contrary legislative intent, all forms of the article are included as long as the article is recognizable as such. Nootka Packing Co. et al. v. United States, 22 CCPA 464, T.D. 47464; C. J. Tower & Sons v.

United States, 47 CCPA 85, C.A.D. 734. "Stated otherwise, all forms, grades and qualities of the named articles are embraced by such a designation." United States v. Williams Clarke Co., a/c American Agar and Chemical Co., 50 CCPA 67, 70, C.A.D. 822. Under this principle, a provision for "planks" would include planks in all forms. It follows that a provision for hardwood flooring in planks includes all forms of hardwood flooring planks unless a contrary legislative intention exists. The heading preceding item 202.57 manifests that Congress intended to include in the two following items wood flooring in strips, planks, blocks, assembled sections or units, or other forms (except softwood flooring classifiable as lumber). Thus if hardwood flooring in strips and planks is excluded, there remains wood flooring in blocks, assembled sections or units, or other forms. The Tariff Classification Study (schedule 2, p. 22) notes as to the flooring covered by item 202.60:

> * * * This flooring is in blocks, assembled sections or units, or other forms, and includes short strips of accurately milled wood, either separate, in sets, or assembled in sections for parquet and similar types of patterned floors. It also includes preassembled sections of strip flooring.

The evidence in the instant case indicates that Doweloc is not what is known in the trade as flooring in blocks, assembled sections or units, nor is it the parquet or patterned flooring mentioned in the Tariff Classification Study. Since the merchandise here is hardwood flooring in plank form, it corresponds more closely to the specification, hardwood flooring in planks, than to the more general description, wood flooring in other forms.

On the record presented and for the reasons stated, we hold that the merchandise involved herein is properly dutiable at 4 per centum ad valorem under item 202.57 of the Tariff Schedules of the United States, as hardwood flooring in strips and planks, whether or not drilled or treated. The protest is sustained and judgment will be entered for the plaintiffs.