(C.D. 2737)

BAILEY-MORA COMPANY, INC., ET AL. v. UNITED STATES

United States Customs Court, First Division

(Decided July 26, 1966)

*Glad & Tuttle (Edward N. Glad* of counsel) for the plaintiffs.
*John W. Douglas,* Assistant Attorney General (*Sheila N. Ziff,* trial attorney), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: The merchandise involved in these cases, which have been consolidated, was imported from Mexico and entered at the port of El Paso, Tex., on various dates in 1961, 1962, and 1963.[1] All of the items were assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373 and T.D. 52476, as manufactures of wood, not specially provided for. Various claims are made in the protests, as amended, but that relied upon is that the items are properly dutiable at 25 cents per 1,000 feet, board measure, under paragraph 401 of said tariff act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as sawed pine lumber, and subject to internal revenue tax at 75 cents per 1,000 feet, board measure, under section 4551 of the Internal Revenue Code of 1954, as modified, as sawed pine lumber, planed or dressed on one or more sides.

The Government conceded, at the trial, that the item described as "pattern R–4–E, 1 by 6, ¹¹⁄₁₆ by 5½," covered by entry 2259, protest 63/4914, is lumber not further advanced than planed or tongued and grooved. It contends that the collector's classification was correct as to all other items, except exhibit 11, which it claims is molding to be used in architectural and furniture decoration, dutiable at 17 per centum ad valorem under paragraph 412, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108.

The pertinent provisions of the tariff act, and as modified, and the Internal Revenue Code, and as modified, are as follows:

[Par. 412, as modified by T.D. 52373 and T.D. 52476]    Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

*        *        *        *        *        *        *

Other (except * * *)_____ 16⅔% ad val.

[Par. 401, and as modified by T.D. 51802]    Sawed lumber and timber not specially provided for, if of fir, spruce, pine, hemlock or larch _____ 25¢ per 1000 ft., board measure.

* * * and in estimating board measure for the purposes of this paragraph no deduction shall be made on account of planing, tonguing, and grooving: * * *.

---

[1] Testimony was taken before Judge Ford at El Paso, Tex., on February 9, 1965, and in Phoenix, Ariz., on February 15, 1965. Plaintiffs' brief was filed on June 7, 1965, defendant's on January 19, 1966, and plaintiffs' reply brief on March 8, 1966.

[Sec. 4551, Internal Revenue Code of 1954 (formerly section 3424 of the Internal Revenue Code of 1939), as modified by T.D. 51802] Lumber, including sawed timber, rough, or planed or dressed on one or more sides (except * * *) :

\*  \*  \*  \*  \*  \*  \*

Fir, spruce, pine, hemlock, larch, and cedar (except * * *)
75¢ per 1000 ft.,
board measure.

Sec. 4552.

(a) Board measure. In determining board measure for the purposes of this subchapter, no deduction shall be made on account of planing, tonguing, and grooving.

[Par. 412, as modified by T.D. 54108] Wood molding and carvings to be used in architectural and furniture decoration_____ * * * 17%
ad val.

Plaintiffs claim that the items here are nothing more than pine lumber, not further advanced than by sawing, planing, tongue-and-grooving, such as involved in *Best Moulding Corporation* v. *United States (Brown, Alcantar & Brown, Inc., Party in Interest)*, 51 CCPA 7, C.A.D. 829. The merchandise in that case consisted of pine wood moldings produced on a molding machine. It was held not to be further advanced than "planing" on the ground that "planing" included wood moldings produced on a molding machine. It was also held that such moldings were not the "Wood moldings and carvings to be used in architectural and furniture decoration" covered by paragraph 412. The trial court's description of the merchandise was quoted, as follows (pp. 8–9) :

An examination of the merchandise as represented by the samples shows it to consist of strips of wood exhibiting various contours, such as quarter round, full round, cove, and others denominated by the witnesses as base, lattice, stop, ceiling mold, and so on. The merchandise is imported in bundles, each containing moldings of a particular pattern in a given length and size.

The record shows that, generally speaking, the moldings here involved are stock items, that is to say, they are common sizes, forms, and shapes of wood moldings made to generally known and widely used standards. However, in some instances, a pattern or a blueprint may be supplied to the mill producing the moldings calling for a special size, shape, or form of molding other than standard.

Further, the record indicates that, whether made under standard or special qualifications, the moldings in all cases are bought and sold on a linear or board foot basis and are not cut to size by the producer for particular uses.

Ten witnesses testified in the instant case, and the testimony of four witnesses in the *Best* case was incorporated herein:
For the plaintiffs:

Oscar L. Shannon, plant superintendent of Molduras De Pino, the manufacturer.

Robert E. Kolliner, owner of Kolliner Lumber Co.

For the defendant:

Joseph R. Bierd, vice president of Southwest Millwork Manufacturing, millwork manufacturer.

John C. Harbin, Jr., president of Harbin Sales, Inc., millwork manufacturer.

R. L. Silvey, president and general manager of Silvey Products Co., molding and millwork manufacturer.

David D. Day, building contractor with Day Construction Co.

Thomas J. Hedrick, general manager and vice president of Continental Moulding Co., molding and millwork manufacturer.

John E. Black, manufacturer's agent for the southwestern sales area for Ideal Co., manufacturer and seller of millwork items.

Walter T. Howard, who has had a variety of positions in the forest products business.

T. R. Allen, manager of the molding plant of Southwest Forest Industries, processor of wood products, lumber, and moldings.

Incorporated testimony:

Oscar L. Shannon.
Robert E. Kolliner.
T. R. Allen.
Carl Bonner of Best Moulding Corporation.

Official or representative samples of the merchandise involved in the consolidated cases and other exhibits were in evidence. Some of these had also been presented in the *Best* case.

According to the testimony herein, the merchandise was produced on molding machines in the same way as that involved in the *Best* case. Defendant questions this only as to exhibit 11, on the basis of the sample itself. A comparison of the samples in this case with those in the *Best* case discloses that the ones here are larger in width and thickness and are of somewhat more intricate pattern. None of the samples were representative as to length, but the evidence indicates that the merchandise was produced and sold in random lengths, the length being determined by the lumber. There is also evidence that moldings may be in very intricate profiles or less so; that the output of molding machines are finished moldings, ready for use except for cutting to length, and that smaller machines are used to produce smaller patterns, and vice versa.

The principal dispute between the parties (except as to exhibit 11, discussed, *infra*), is whether the items here have been so dedicated to a single specific use as to take them out of the classsification of sawed

lumber, not further advanced than planed. The trial court referred to this issue in the *Best* case (49 Cust. Ct. 102, 106, C.D. 2366), wherein it noted that in *United States* v. *Dudley*, 174 U.S. 670, the court made a distinction between wood materials, bought and sold by the thousand feet, and wood so made as to be dedicated to a single purpose and bought and sold by the unit. It also distinguished *United States* v. *C. S. Emery & Co.*, 18 CCPA 208, T.D. 44399, pointing out that—

\* \* \* the thresholds were "ordered and imported in certain lengths or multiples of such lengths as are desired for certain sized doors" and that the stair rails were "ordered in the lengths desired." It is apparent that, in holding the thresholds and stair rails to be manufactures of wood rather than lumber, the determining factor was that the imported articles had been made to fit certain sized doors or stairs. They were in lengths referable to the article itself, rather than in lengths intended for and suitable for use anywhere, as is the wood molding in this case.

See also on this point our discussion in *Acme Venetian Blind & Window Shade Corp.* v. *United States*, 56 Cust. Ct. 563, C.D. 2704.

The merchandise in the instant case is bought and sold on the lineal foot basis and, as imported, is not ordinarily cut to length for particular uses. The rules for the Western Pine Association provide that lengths shall be 3 to 20 feet in multiples of 1 foot, not over 15 percent under 8 feet in any one item. (Exhibits 15 and 16.)

The parties stipulated that certain of the exhibits were representative of certain pattern numbers and Mr. Shannon identified most of them with patterns in either Western Moulding Patterns, WP Series (exhibit 15) or Western Pine Club's 8000 Series Mouldings (exhibit 16) or both. A list of the samples, their names, and the pattern numbers follows:

| Exhibit | Name | Pattern No. | |
|---|---|---|---|
| 1 | Hand rail or rounds | WP 231 | (p. 13) |
| 2 | Stool | WP 1036 | (p. 25) |
| | | 8267 | (p. 32) |
| 3 | Stool | WP 1096 | (p. 26) |
| | | 8938 | (p. 33) |
| 4 | Stool | 8938 | (p. 33) |
| 5 | Stool | WP 1071 | (p. 26) |
| | One-half stool | 8269 | (p. 3) |
| 6 | Stool | | |
| 7 | Sash bar | 8794 | (p. 54) |
| 8 | Blind stop | | |
| 9 | Tee astragal | 8876 | (p. 41) |
| 10 | Back band | 8313 | (p. 6) |
| 11 | Mantle, casing or apron | WP 286 | |
| | | 8842 | (p. 6) |
| 12 | Rabbet hook strip window frame stock | 8816 | (p. 52) |
| 13 | Combination screen and bead | 8762 | (p. 56) |

Mr. Shannon testified that exhibit 10 is in the same pattern but not the same dimension as pattern 8313; that pattern 8842 is a similar pattern to exhibit 11 in a smaller size; that exhibit 12 has eased edges whereas pattern 8816 has squared edges; and that exhibit 13 is a combination screen rail and bead whereas pattern 8762 is the bead only.

The court also received in evidence without being marked the official papers in entry 2880 of protest 63/4914 and entry 2686 of said protest. Counsel stated:

Mr. Glad: * * * However, there are two items involved in the consolidated protests, one being item in entry 2880 of 63/4914, described as bar casing, $\frac{3}{4}$ by $1\frac{3}{16}$, and the item described in entry number 2686, of 63/4914, as a flat stool, $1\frac{1}{16}$ by $5\frac{1}{4}$. However, the official commercial invoices have had drawn on them in red ink by the examiner at the time that he was examining the merchandise, the profile of each of the items involved herein, and for that reason, I would like to offer the official papers in evidence without asking them to be marked.

Mr. Kolliner testified that he was familiar with articles, such as these exhibits; that they are used in home construction principally, and that they are functional. When asked whether the items involved here have the same or different uses as those in the *Best* case, he stated:

In the sense that these items are used in home construction, they are used for the purpose of covering a crack, or of welding or bring together two items of glass, plywood, or other materials, in that sense, they are identical in use to the items that were referred to in the *Best Moulding* case.

Mr. Kolliner also testified that the names in the pattern books refer to the historic principal use of the items, but do not limit the uses, and that in fact certain of the moldings no longer have the principal use indicated by the title. Mr. Silvey stated that the names in exhibits 15 and 16 indicate the primary uses of the items; that the uses have remained the same throughout, and that such items are referred to as moldings. Mr. Harbin had heard these items referred to as wood moldings and said that except for exhibit 11, they all have functional uses. Mr. Silvey and Mr. Howard testified that exhibits 1 through 13 are items dedicated to a single use and Mr. Allen stated that certain exhibits from the *Best* case were not so dedicated. However, Mr. Bonner testified in that case that each pattern had a specific use.

Testimony as to the uses of the particular items here involved is as follows:

## Exhibit 1

This item is called a hand rail, a stair rail, or a wall rail. Its primary use is as a hand railing to assist people in going up and down stairs or when in a hazardous place. It is cut to length on the

site, brackets are applied to the wall, and the rail is screwed to the brackets. It may also serve as the railing of a wall to keep chairs from bumping into or marking the plaster. One witness had seen it in dance academies along a wall on brackets. (Kolliner, R. 39–40; Bierd, R. 61; Harbin, R. 77; Silvey, R. 96–97; Day, R. 120; Hedrick, R. 131; Howard, R. 153.)

### Exhibits 2, 3, 4, 5, and 6

These items are called stools or parts of stools and are used chiefly in the base or bottom of a window frame, to cover the window sill, to extend the bottom of the sill, to block air flow and for trim. They are cut to length, fitted and nailed down. Exhibit 6 is made for a particular brand of window, but the others may be used for any type of window. One witness had seen exhibit 4 and similar patterns used as a base. (Kolliner, R. 40–41; Bierd, R. 62–64; Harbin, R. 77–79; Silvey, R. 98–100; Day, R. 121; Hedrick, R. 131–132; Black, R. 144; Howard, R. 153.)

### Exhibit 7

This item is called a sash bar, a window muntin, a muntin bar or a division bar for check rail windows. It is used to divide a window into panes or sections. It is cut to length, coped on the end, and set into the sash to divide the flash in the window. (Bierd, R. 64; Harbin, R. 79; Silvey, R. 100–101; Day, R. 121–122; Hedrick, R. 132; Black, R. 145.)

### Exhibit 8

This is called a blind stop and is used as a division between the upper sash and outside casing of a window frame, as an exterior part of a double hung window and on the exterior of a window to keep the sash in place. It is cut to length and nailed to the frame. (Bierd, R. 65; Harbin, R. 80; Silvey, R. 101; Hedrick, R. 132–133; Black, R. 145.)

### Exhibit 9

This is called an astragal or tee astragal and is used to close the opening where two doors meet; to keep two French doors from going past each other, or to join any material together. It is cut to length and nailed to one door in order to stop the other door. Some companies manufacture it in the lengths of the doors with which it is to be used. (Kolliner, R. 44, 55–56; Bierd, R. 65, 69; Harbin, R. 80; Silvey, R. 101–102; Day, R. 122; Hedrick, R. 133; Black, R. 146.)

### Exhibit 10

This is known as a back band and is used to cover the end of a piece of plywood to form the corners on glass top tables; at the end of a panel or over the casing of a door, as a decorative molding behind a

casing or on a base. It is cut to length and nailed where it is going to be used. It is an extra decorative detail, and, according to some witnesses, is hardly used any more. (Kolliner, R. 45; Bierd, R. 66; Harbin, R. 80, 87; Silvey, R. 102, 104; Hedrick, R. 133-134.)

### Exhibit 11

It is a detailed or decorative molding, not a mantle. It is used around a fireplace, as a face around the top of a room, or a cornice, or in any decorative method of paneling; for a panel molding on a ceiling or on the walls, or for any other decorative purpose for which it might fit. It had no functional purpose. (Bierd, R. 66, 71; Harbin, R. 81, 86; Silvey, R. 103; Day, R. 122-123; Hedrick, R. 134-135; Black, R. 146.) It was stipulated that this exhibit 11 was representative of the profile described on entry 3832, protest 63/7295, as WP 286, and Mr. Shannon said it was depicted on page 6 of the pattern book, exhibit 16, No. 8842, but Mr. Silvey and Mr. Hedrick said it was not in that exhibit.

Exhibit 11 does not resemble pattern WP 286 in exhibit 15 (p. 14), but is somewhat similar to No. 8842 in exhibit 16 (p. 6).

### Exhibit 12

This is called a rabbet hook and is used to cover the rough end of a piece of plywood to give a finished looking appearance on formica or glass surfacing and to support shelves. For the latter use it is cut to length and nailed in the closet to support the shelves. (Kolliner, R. 46; Bierd, R. 67; Harbin, R. 81; Silvey, R. 103; Hedrick, R. 135.)

### Exhibit 13

It is a screen rail and bead used in the manufacture of window screens. The item is cut to length, the bead popped out, the screen wire attached to the frame, and the bead reapplied. (Bierd, R. 67, 71-72; Harbin, R. 81-82; Silvey, R. 104-106; Hedrick, R. 136; Allen, R. 176.)

Drawing on commercial invoice—Entry 2686, protest 63/4914

This is a flat window stool, used in the construction of windows. It is cut to length, fitted at the bottom of the window, and nailed to the sill. (Harbin, R. 82; Silvey, R. 107-108; Day, R. 124; Hedrick, R. 136-137; Allen, R. 166.)

Drawing on commercial invoice—Entry 2880, protest 63/4914

It is a sill connector or extender or a two-piece window sill. It is used to extend the width of a sill or to tie two sills together in double hung windows. It is cut to length and nailed on the sill. (Harbin, R. 83; Silvey, R. 107; Hedrick, R. 137.)

There were received in evidence as exhibits 20, 21, and 22, three items which were involved in the *Best* case: A cove molding, a full round,

and a screen bead. Mr. Allen and Mr. Silvey testified that the cove molding is used for joining corners on ceilings or walls, in various places, in building picture frames, and in making details on exterior doors. The full round is used as closet poles and flagpoles and in room divider construction or as a frame around a semidivider. The screen bead is used to attach plastic screens, as a batt mold, and for casing plywood. These witnesses said such items are not dedicated to specific uses.

All of the items in the present case were made on molding machines; most of them are in the pattern books and are stock items; they have individual names; some of them appear to be limited to one sort of use, but others are not. They have to be cut to length and in some cases fitted for use as stair rails, parts of windows or window frames, casing, decorative molding, shelf supports, or window or door screens. Considering samples as "potent witnesses," there seems little to distinguish those received here from those in the *Best* case.

In *United States* v. *C. S. Emery & Co.*, *supra*, heavily relied on by defendant, the merchandise consisted of outside and inside thresholds, called doorsills, made by planing, beveling, and grooving, and stair rails. The first items were invoiced as thresholds and were ordered in certain lengths or multiples of such lengths as were desired for certain sized doors. The stair rails were also ordered in the lengths desired. Some additional cutting and fitting may have been necessary for the final use. The court held that they were dutiable as manufactures of wood, stating (p. 210):

The wording of the free-list paragraph would indicate that Congress contemplated the free listing of certain lumber which had been manufactured, such as flooring and ceiling, although the processes of manufacture employed might result in a manufacture of wood, and although the wood, when so manufactured, was designed to be used and fit only for use for one definite purpose. But, we see nothing in the paragraph that would indicate that a floor or a ceiling, made from the manufactured lumber should be free.

The difficulty with the importer's position is that the importation at bar is no longer lumber which is sawed, planed, and tongued and grooved, but is a distinct article made from lumber, which, in the process of making, has been sawed, planed, and tongued and grooved. Flooring, siding, and ceiling may be sawed, planed, and tongued and grooved and yet it is material for making floors, ceilings, and sidings. In the instant case the article which is sawed, planed, and tongued and grooved, is no longer lumber material for making anything, but is the thing itself and is a manufacture of wood, and, we think, dutiable under paragraph 410.

The court distinguished certain earlier cases on the ground—

* * * that in each of these cases the merchandise was dedicated to a certain use but that it had not been processed to the extent that it became the article for which the material was intended. The ceiling

boards were not ceilings, the flooring boards were not floors, and the cello material was not the backs, tops or sides for cellos. Neither were the cedar pencil blocks converted into pencils or any part of pencils.

In the instant case the sawed, planed, and tongued and grooved wood was no longer lumber dedicated to the making of some article as in the cases above cited, but it was wood which has been processed into the article itself. * * *

In *C. J. Tower & Sons* v. *United States*, 40 CCPA 30, C.A.D. 493, wood cut to specifications and ready as imported to be assembled into framework for shipping crates, according to blueprints, was held to have become a manufacture of wood dedicated to a definite and specific use. The merchandise was unassembled framework rather than lumber material.

On the other hand, in *C. S. Emery & Company* v. *United States*, 28 Cust. Ct. 303, C.D. 1427, it was held that boards intended to be used in the construction of silos were not so advanced as to be manufactures of wood. The court noted that the silos were not to be made by mere assembly of the imported material, but the material was to be used to construct silos. It stated (pp. 305–306) :

The record shows that in constructing the silos in contemplation here, doors had to be framed, cut, and built, barn connections made, chutes had to be constructed and placed, and roofs had to be built, largely with materials other than the imported lumber, and that metal parts, such as anchor irons, hoops, and rods, had to be supplied and fitted. In this situation, we do not think that the imported lumber can be considered as knocked-down or unassembled silos.

In *Border Brokerage Co. et al.* v. *United States*, 52 Cust. Ct. 204 C.D. 2461, one- and two-piece pattern stock, planed, bullnosed, eased, and grooved, designed to be used and fit only for use in the manufacture of drawer sides, was held to be lumber, not further manufactured than planed and tongued and grooved. The court pointed out that the merchandise in its imported condition was not drawer sides but required further manufacturing efforts to make it such.

If the *Best* case and the *Emery* case (18 CCPA 208, T.D. 44399), are not in harmony, the *Best* case, as the later, would control. Therefore, the Government to prevail would need not just to bring the case under *Emery* but also to show that the result it urges is consistent with *Best*. The merchandise herein is produced by the same methods as that in *Best*, feeding of rough lumber through molding machines, with four cutter heads which are revolving tools having inset knives, set in positions around the lumber as it passes through, to produce a wood article of uniform cross section as designed, with flat, concave, or convex surfaces. The samples are similar too. The only significant difference is in certain testimony. In *Best*, only one of the several witnesses testified about the end uses, and he said without contradiction

that the merchandise was of stock patterns and had a multiplicity of uses in construction. (However, we found as already quoted, that some of the merchandise was specially made up to the specification of particular customers.) It was not cut to the length in which it was to be ultimately used, that being left to be done on the job site with a hand saw. Here, the Government developed with some success that the involved moldings, or many of them, though stock, had but a single use, as, e.g., stair rails, screen frames, or door astragals. Its argument, founded on *Emery*, is that this established that the imported

millwork items at bar, by reason of having been manufactured into finished articles dedicated to a specific use, and bearing a new nomenclature, are manufactures of wood within the scope of paragraph 412.

This presents us with an issue considered by the trial court in the *Best* litigation, but not so conspicuous in the then record and not mentioned in the appellate opinion. However, the *Emery* case is a difficult take off for the argument because the opinion there is so carefully limited to the facts before the court. It concedes, in language quoted above, that lumber may be manufactured to the point where it is "fit only for one definite purpose" without losing its character as lumber. What distinguished factually the door sills and stair rails there involved? They were cut to length for particular applications; therefore, they were not mere material for making floors, ceilings, and sidings, but "the thing itself." Naturally, were the issue new, one would think a free list provision for "lumber, not further manufactured than sawed, planed, etc.," might include all forms of the described article, unless it is more specifically described in another tariff paragraph. Any other exception looks like an anomaly. The *Emery* case establishes that such an exception exists but limits it to the instance designated by the court, where the wood is processed to being a new "thing itself," bought and sold as such, not as lumber. *C. J. Tower & Sons* v. *United States*, *supra* (unassembled frames for shipping crates), does not extend the exception further. We think the exception thus remains narrow and the other cases cited above, as well as *Best*, establish the general rule—recognized as such even in *Emery*—that a duty provision for lumber not further advanced than sawed and planed includes all forms of such lumber. If varied uses of the stock items was a decisive factor in *Best*, the specially specified items should have been shunted aside and treated differently, but in fact they were not.

Here, the molding or millwork as imported is "specially dedicated" to a family of related uses, to be sure, but within that family choices remain which are not foreclosed until, after importation, the article is cut and the ends shaped to the requirements of the particular use for which it is selected. The stocking of the articles, in warehouses and lumber yards, further imports that these are not specially designed

unassembled parts to fit a particular architectural design, but common use items. Thus, the Government is seen to have been misled by the semantic uncertainty inherent in the word "dedicated." The merchandise held to be lumber in *Border Brokerage Co. et al.* v. *United States, supra,* and in *Acme Venetian Blind & Window Shade Corp.* v. *United States, supra,* was completely "dedicated" to use as drawer sides and as slats for blinds and screens, respectively, and was to be used in each case only by the importer in its own manufacturing operation. Thus, before we rely on "dedication" as decisive to take the case out of the general rule, we must be certain what kind of "dedication" we are talking about. Not every plain, ordinary, garden variety "dedication" will do.

The Government further relies on our decision in *Morris Friedman* v. *United States,* 51 Cust. Ct. 88, C.D. 2415, but the retrial of that issue has generated the new decision, *Acme, supra,* which robs *Friedman* of its precedent value, in our opinion.

Defendant has raised a different claim as to exhibit 11, namely, that it is properly classifiable under paragraph 412, as modified, as wood moldings to be used in architectural and furniture decoration, relying on *Bendix Manufacturing Company* v. *United States,* 28 Cust. Ct. 144, C.D. 1401. That case involved narrow strips of wood, produced by turning, concededly used in architectural and furniture decoration, having profile and section changes rhythmically repeated. They were claimed to be "turnings" rather than "moldings" and dutiable as manufactures of wood, not specially provided for. The court held that the fact that they were produced on a turning machine rather than a molding machine was immaterial and that they were classifiable as wood moldings to be used in architectural and furniture decoration.

The *Bendix* case was distinguished in the *Best* case, and the court pointed out (p. 14):

> * * * In that case the merchandise was not the same as the merchandise here involved. There the merchandise constituted turnings having different cross-sectional widths. The merchandise was described as comparatively narrow strips or bands of wood "whose profile and sections changes are rhythmically repeated." In contrast, each piece of lumber imported here has a constant cross-sectional width throughout its length. Also in the *Bendix* case, the merchandise was produced in a manner quite different than that employed in producing the merchandise before this court. The process used there involved use of a turning machine where the wood was cut across the grain as well as along it. Obviously that was more than being subjected to "planing" in a molding machine.

The court also examined the legislative history of the provision for wood moldings in paragraph 412 and found that it was intended to cover the type of ornate carving for which wood carvers are specially qualified.

Exhibit 11, in the instant case, is more intricate than the other moldings, but there is nothing to indicate that it was produced by any different method or that it was subjected to additional manufacturing processes. It does not have profile and sectional changes which are rhythmically repeated but has a constant cross-sectional profile throughout its length. It is used for decoration, but it does not appear to be the type of wood molding decoration covered by paragraph 412, which was intended to benefit wood carving craftsmen.

For the reasons stated, the protests herein are sustained to the extent that the merchandise involved herein is held dutiable under paragraph 401 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at 25 cents per 1,000 feet, board measure, and subject to internal revenue tax under section 4551 of the Internal Revenue Code of 1954, as amended by said trade agreement, at 75 cents per 1,000 feet, board measure, as sawed pine lumber, not further advanced than planed. As to all other claims, the protests are overruled.

Judgment will be rendered accordingly.