A. N. DERINGER, INC.
v.
UNITED STATES.
C.D. 3530;  Protest 67/18316–4076.

United States Customs Court,
First Division.
Aug. 8, 1968.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Steven R. Sosnov, New York City, trial attorney), for defendant.

Before WATSON and MALETZ, Judges.

MALETZ, Judge:

This case involves the proper classification of four shipments of certain wedge-shaped wooden articles that were imported from Canada in 1965 and 1966 and described on the invoices as "horse-feathers." They were classified by the government under item 207.00 of the Tariff Schedules of the United States as articles of wood, not specially provided for, and assessed with duty at the rate of 16⅔ percent ad valorem. Plaintiff claims that the imports are properly classifiable under item 202.03 of the tariff schedules as rough spruce lumber dutiable at the rate of 35 cents per thousand feet, board measure.[1]

The pertinent provisions of the Tariff Schedules of the United States are quoted below:

Assessed under:

Schedule 2, part 1, subpart F

Subpart F headnotes:

1. This subpart covers all products of wood which are not provided for elsewhere in the tariff schedules.

| Item | Articles | Rates of Duty [1] |
|---|---|---|
| 207.00 | Articles not specially provided for, of wood | 16⅔% ad val. |

Claimed under:

Schedule 2, part 1, subpart B

Subpart B headnotes:

1. This subpart covers lumber, wood siding, wood flooring, wood moldings, and certain wood

---

[1]. Three of the four shipments were manufactured and exported by the Luceville Lumber Co., Ltd., Quebec, while the fourth (entry No. F–2520) was exported by another company—Eastern Canada Products, Inc., Quebec. Plaintiff produced no evidence regarding the merchandise exported by the Eastern Canada Products Company and has requested that its protest be sustained only as to the shipments exported by the Luceville company. The protest covering entry F–2520 is, therefore, deemed abandoned.

carvings and ornaments, including such products when they have been drilled or treated.

2. For the purposes of this part, the following terms have the meanings hereby assigned to them:

(a) Lumber: A product of a sawmill or sawmill and planing mill derived from a log by lengthwise sawing which, in its original sawed condition, has at least 2 approximately parallel flat longitudinal sawed surfaces, and which may be rough, dressed, or worked, as set forth below:

(i) rough lumber is lumber just as it comes from the saw, whether in the original sawed size or edged, resawn, crosscut, or trimmed to smaller sizes;

(ii) dressed lumber is lumber which has been dressed or surfaced by planing on at least one edge or face; and

(iii) worked lumber is lumber which has been matched (provided with a tongued-and-grooved joint at the edges or ends), shiplapped (provided with a rabbeted or lapped joint at the edges), or patterned (shaped at the edges or on the faces to a patterned or molder form) on a matching machine, sticker, or molder.

\*    \*    \*    \*    \*    \*    \*    \*

3. Lumber, including certain flooring provided for in this subpart, is dutiable on the basis of "board measure" for which the unit of measurement is the board foot. For the purposes of this subpart, a board foot is the quantity of lumber contained in, or derived (by drying, dressing, or working, or any combination of these processes) from, a piece of rough green lumber 1 inch in thickness, 12 inches in width, and 1 foot in length, or the equivalent of such piece in other dimensions.

\*    \*    \*    \*    \*    \*    \*    \*

| Item | Articles | Rates of Duty 1 |
|---|---|---|
| | Lumber, rough, dressed, or worked (including softwood flooring classifiable as lumber, but not including siding, molding, and hardwood flooring): | |
| | Softwood: | |
| 202.03 | Spruce (Picea spp.) | 35¢ per 1000 ft., board measure |

A single witness—presented by plaintiff—testified at trial. He was Robert St. Laurent, the secretary-treasurer and assistant general manager of the Luceville company—the manufacturer-exporter of the merchandise in question. The witness, the record showed, was familiar with the company's operations, its methods of production, and the merchandise described on the invoices as "horsefeathers." His testimony established the following. The first step in the production of horsefeathers is the sawing of spruce logs lengthwise into boards (or planks) of various thicknesses (*e. g.,* ⅝″, ⅞″, 1″, 1¼″, 1¾″, etc.), and crosscutting them into various lengths. A sample in evidence (plaintiff's exhibit 1) representing this stage of the process is a board that is almost 1″ thick (and 3″ wide); its longitudinal sawed surfaces are flat and approximately parallel.[2]

The boards (such as exhibit 1) are stored in the yard to dry and then resawn longitudinally through their centers to a thickness of about a half inch. A sample in evidence (plaintiff's exhibit 2) shows that this board—the product of this second step—also has approximately parallel flat longitudinal sawed surfaces.

The third and final stage in the production of horsefeathers consists of a further (or second) longitudinal or lengthwise *resawing*. At this stage, however, the device that feeds the boards into the saw is tilted so as to produce a beveled cut, *i. e.,* a cut at an angle that divides each board into two wedge-shaped articles known as horsefeathers—samples of which are in evidence (plaintiff's exhibit 3). When a sample horsefeather is observed from either end, the cross section viewed is that of a right triangle. In other words the upper and lower surfaces are not parallel, there being instead a gradual tapering or tendency of the two surfaces to meet.

The record shows that horsefeathers are less advanced than (i) lumber which has been dressed or surfaced by planing; (ii) lumber which has been matched (*i. e.,* provided with a tongued and grooved joint at the edge or ends); (iii) lumber that has been shiplapped (*i. e.,* provided with a rabbeted or lapped joint at the edges); and (iv) lumber that has been patterned (*i. e.,* shaped at the edges or on the faces to a patterned or molded form).

As to usage, horsefeathers are employed as a backing on the side or roof of a building in order to make the surfaces flat or level prior to the installation of resurfacing materials such as asphalt shingles or clapboard. When so used, the horsefeathers may require still further cutting to obtain the desired lengths. They do not require a finished surface because they are covered up in use.

In summary, the record establishes that to produce horsefeathers one starts by sawing a log (longitudinally) into boards or planks, which are then likewise center resawn (longitudinally); that the original boards, as well as the center resawn boards, have at least two approximately parallel longitudinal sawed surfaces; that the resawn boards are simply resawn again longitudinally at an angle or bevel to produce horsefeathers; and that the only other sawing required is the crosscutting of the boards to length. The record also establishes that the original sawed product and the resawn product (exhibits 1 and 2) cannot be used in the same manner as horsefeathers, which are the final beveled product, and that the beveling causes a change in use. Thus, the essential difference between the original sawed and resawn products (exhibits 1 and 2) and horsefeathers is that the horsefeathers have been resawn from the original piece of lumber and are made for a special purpose.

2. The length of the board varies according to grade, the better grades being 8 to 16 feet long, while the lower grades are approximately 4 to 6 feet in length. The planks are crosscut to the desired lengths at the sawmill. Of the three entries with which we are concerned, two cover horsefeathers that are 4 feet long, while the third does not specify length and apparently involves an assortment of various lengths.

In this setting, plaintiff maintains that the imported horsefeathers fall squarely within the statutory definition of lumber set forth in schedule 2, part 1, subpart B, headnote 2, which (as we have seen) provides:

2. For the purposes of this part, the following terms have the meanings hereby assigned to them:

(a) *Lumber:* A product of a sawmill or sawmill and planing mill derived from a log by lengthwise sawing which, in its original sawed condition, has at least 2 approximately parallel flat longitudinal sawed surfaces, and which may be rough, dressed, or worked, as set forth below:

(i) *rough lumber* is lumber just as it comes from the saw, whether in the original sawed size or edged, resawn, crosscut, or trimmed to smaller sizes  *  *.

The above result is required, plaintiff adds, because the horsefeathers are the product of a sawmill; they are derived from a spruce log by lengthwise sawing; in their *original* sawed condition they have at least two approximately parallel flat longitudinal sawed surfaces; and they are "rough lumber" as defined above in that they have not been altered except to be resawn and crosscut to smaller sizes as permitted by the statutory definition. Defendant's argument, on the other hand, is that the statutory definition of lumber is not all-inclusive; that generally if a new and different product emerges which has a different name, character or use from its predecessor, it is a manufacture;[3] that the line must be drawn somewhere, and the general concept of a change in name, character or use should be the accepted criterion here; and that on this basis horsefeathers are a manufacture of lumber and thus are more than mere lumber since they have a different name, character and use from their predecessor—rough lumber.

█ For the reasons that follow, we conclude that the horsefeathers involved in this case are lumber as claimed by plaintiff, and that defendant's argument is without merit. We note at the outset that the tariff schedules here in question do not make a distinction between a manufacture of wood as such and lumber. Thus item 207.00—the tariff provision invoked by the government—provides not for manufactures of wood but rather for "articles" of wood. By contrast, earlier tariff acts did contain a specific provision for "manufactures of wood," as well as a provision for lumber not further advanced than sawed and planed lumber. But even under these earlier statutes, items such as those involved here were held properly dutiable as lumber rather than as manufactures of wood notwithstanding that they were known by a separate name other than "lumber" and notwithstanding that as a result of sawing and planing their character was so changed that they were useful for only a single purpose (as opposed to rough lumber which is useful for a multitude of purposes). Included among such items—which the courts classified as lumber rather than as manufactures of wood—were: Pieces of maple and spruce about 15 inches long by 4½ inches wide, wedge-shaped, partially sawed through lengthwise, partially planed, and used to make cello, violin and viola tops, bodies and sides, United States v. Gallagher & Ascher, 12 Ct.Cust. App. 472, T.D. 40670 (1925); moldings, Best Moulding Corporation v. United States, 51 CCPA 7, C.A.D. 829 (1963), and Bailey-Mora Company, Inc., et al. v. United States, 57 Cust.Ct. 99, 109–10, C.D. 2737 (1966); boards designed for use as inside ceiling, and boards chiefly used as siding for frame buildings, Unit-

---

3. For this general principle, defendant cites such cases as Anheuser-Busch Brewing Association v. United States, 207 U.S. 556, 562, 28 S.Ct. 204, 52 L.Ed. 336 (1908); United States v. National Starch Products, Inc., 318 F.2d 737, 50 CCPA 1, C.A.D. 809 (1962); H. Muehlstein & Co., Inc., et al. v. United States, 44 CCPA 107, C.A.D. 645 (1957). None of these cases deals with the distinction between lumber and a manufacture of wood.

ed States v. Myers & Co. et al., 5 Ct. Cust.App. 541, T.D. 35179 (1915); stock solely used in the manufacture of sides of drawers for furniture, B. A. McKenzie & Co., Inc. v. United States, 39 Cust. Ct. 52, 56–57, C.D. 1903 (1957), and Border Brokerage Co. et al. v. United States, 52 Cust.Ct. 204, C.D. 2461 (1964); slats for blinds and screens, Acme Venetian Blind & Window Shade Corp. v. United States, 56 Cust.Ct. 563, C.D. 2704 (1966); boards intended to be used in the construction of silos, C. S. Emery & Company v. United States, 28 Cust.Ct. 303, C.D. 1427 (1952); tongued and grooved knotty pine paneling, C. S. Emery & Company v. United States, 41 Cust.Ct. 7, C.D. 2013 (1958); cedar pencil blocks, sawed to the proper dimensions for the purpose of making pencils and nothing else, United States v. Young, 15 Ct.Cust.App. 111, T.D. 42188 (1927). As this court pointed out in Bailey-Mora Company v. United States, supra, 57 Cust.Ct. at 109, the cases (under the earlier tariff acts) "establish[ed] the general rule * * *, that a duty provision for lumber not further advanced than sawed and planed includes all forms of such lumber."

There is a caveat to what has been said however: If the lumber had been processed to the extent that *it itself* became the article for which the material was intended, then it was dutiable as a manufacture of wood and not as lumber. Thus in United States v. C. S. Emery & Co., 18 CCPA 208, T.D. 44399 (1930), doorsills and stair rails so manufactured by sawing, planing, tonguing and grooving, as to finish them for the purpose intended except to cut them to the lengths desired for certain sized doors, in case of the doorsills, and the cutting to length and fitting of the ends, in case of the stair rails, were held to be no longer lumber material for making anything, but were the things themselves and were accordingly held to be properly classified as manufactures of wood. The court in *Emery* (18 CCPA at 211) adverted to various cases where merchandise was held classifiable as lumber even though

it had been dedicated to a certain use, but distinguished each on the basis that the merchandise there involved

had not been processed to the extent that it became the article for which the material was intended. The ceiling boards were not ceilings, the flooring boards were not floors, and the cello material was not the backs, tops or sides for cellos. Neither were the cedar pencil blocks converted into pencils or any part of pencils.

See also C. S. Emery & Company v. United States, supra, 41 Cust.Ct. at 11; Bailey-Mora Company v. United States, supra, 57 Cust.Ct. at 109. It is of course clear that under this test horsefeathers would be classifiable as lumber and not "manufactures of wood" since they were merely one of the materials used in resurfacing roofs and sides of buildings; they were not "the thing itself." Nor (as set out above) would this result be altered because they were known by a name other than "lumber" or were useful only for a single purpose.

Against this background, it is interesting to note that in 1958—prior to the enactment of the Tariff Schedules of the United States—a representative of the National Lumber Manufacturers Association appeared before the Tariff Commission and recommended that the proposed schedules make a distinction between lumber and manufactures of wood depending on whether the item has been "so far advanced that it can be used only for a definite purpose * * *." Tariff Classification Study—Explanatory and Background Materials—Schedule 2 (1960), p. 246. In this connection he stated (*ibid*):

Like the court [in United States v. Dudley, 174 U.S. 670, 19 S.Ct. 801, 43 L.Ed. 1129 (1899)], we would not contend that the items of dressed lumber mentioned by the court are "manufactures of wood" within the meaning of the tariff laws. We would call attention to the point made by the court, however, that "where a manufactured article, such as sawed lumber, is usable for a dozen different purposes, it does

not ordinarily become a new manufacture until reduced to a condition where it is used for one thing only," and its further statement that "if its manufacture has so far advanced that it can be used only for a definite purpose * * it becomes a 'manufacture of wood'." This is a reasonable basis of distinguishing between lumber and manufactures and we hope the Commission will give serious consideration to the desirability of including such a distinction in its proposed revisions.[4]

█ The distinction thus recommended having been rejected by the Tariff Commission and Congress, it is apparent that the classification of horsefeathers as lumber is in no way changed because horsefeathers are "used for one thing only" or are so far advanced that they "can be used only for a definite purpose." Indeed, the language of the tariff schedules makes it clear that various specified articles (e. g., softwood flooring, hardwood flooring, molding) are properly dutiable as lumber even though they are usable only for a single purpose and are known by a separate name other than "lumber."

Nor is it any bar to the classification of the imports as lumber that their longitudinal surfaces are not parallel. The statutory requirement of parallelism imposed by headnote 2(a) applies only to lumber "in its *original* sawed condition * * *" [emphasis supplied], and the record clearly establishes that "in their

original sawed condition" the imports possessed two parallel flat surfaces. Also significant is the "Brussels Nomenclature" which—as the Tariff Commission pointed out—had an important influence on the arrangement of the proposed revised tariff schedules. Tariff Classification Study, Submitting Report (1960), p. 8. To the extent relevant, the Brussels Nomenclature states:

> 44.05—WOOD SAWN LENGTHWISE, SLICED OR PEELED, BUT NOT FURTHER PREPARED, OF A THICKNESS EXCEEDING FIVE MILLIMETERS.

With a few exceptions, this heading covers *all wood and timber, of any length but of a thickness exceeding 5 mm., sawn along the general direction of the grain or cut by slicing or peeling, but not further worked * *.
* * * * * *

It is to be noted that sawn timber falling within this heading *need not necessarily be of rectangular section nor of uniform section along the length.*[5] [Emphasis supplied.]

The "sawn timber" referred to is the counterpart of "lumber" provided for in the Tariff Schedules of the United States, and (as the above quotation reflects) the mere fact that its cross section (as here) is triangular rather than rectangular (and its longitudinal surfaces thus not parallel) does not preclude its classification as lumber.

---

4. In United States v. Dudley, supra, the Court held that sawed boards and planks, planed on one side, and tongued and grooved, were entitled to free entry as "sawed boards, planks, deals and other lumber, rough or dressed," and that the collector's classification of the articles as manufactures of wood was in error. The Court in *Dudley*, in addition to the language quoted above, went on to add (p. 673, 19 S.Ct. p. 802): "Had it [lumber] so far been changed as to be serviceable for only one thing, *it is possible* that it might be regarded as a separate and independent manufacture, though * * * *this may admit of some doubt.*" [Emphasis supplied.] Thus as early as 1899, the Supreme

Court was hardly clear as to whether an article having but one use should be denied classification as lumber. In fact, in C. S. Emery & Company v. United States, supra, 41 Cust.Ct. at 9–10, the court indicated, in effect, that the *Dudley* decision did, in actuality, question the proposition that suitability for a single purpose precluded classification as lumber. Clearly misplaced in such circumstances is reliance on *Dudley* as authoritative in drawing the "single purpose" distinction between lumber and a manufacture of wood.

5. Vol. II, Explanatory Notes to the Brussels Nomenclature 1955, Ch. 44, pp. 413–14 (1964 ed.).

It is also worthy of mention that, according to the record, horsefeathers are *less* advanced from a processing standpoint than "dressed lumber" and "worked lumber" in headnote 2 of subpart B of schedule 2. Yet dressed lumber and worked lumber are classifiable as lumber. Even products which have been *drilled* or *treated* are so classified. See headnote 1, subpart B, schedule 2. This being the case it would seem anomalous to classify the less advanced products as manufactures of wood and the more advanced products as lumber considering that one purpose of the tariff schedules was to "Eliminate anomalies and illogical results in the classification of articles." Tariff Classification Study— Explanatory and Background Materials— Schedule 2 (1960), p. v.

Defendant, in further support of its position that horsefeathers are not lumber, relies upon letterheads of the ultimate consignee of two of the entries, which letterheads read "LUMBER— HORSEFEATHERS—LATH." Defendant's reasoning apparently is that these letterheads constitute an admission that horsefeathers are not lumber.[6] However, these documents have little probative weight for the letterhead has *another caption*—that is higher on the page and bolder in print than the one relied upon by defendant—which describes the consignee firm as "WHOLESALE LUMBER DEALERS." Thus, the letterhead, if given any probative weight, would tend to establish that *all* products sold by the consignee, *including horsefeathers,* are lumber. Actually, the uncontradicted testimony of plaintiff's witness was that in trade parlance while lath constitutes a separate category than lumber, horsefeathers are considered to be merely a variety of lumber. (R. 23–24) Defendant also relies upon a letter written by an employee of the exporter (defendant's exhibit A) which refers to "horsefeathers." But we fail to see how that letter supports defendant's position in any way since it states specifically that "Horsefeathers is a piece of lumber * * *."

The protest is sustained except as to the merchandise covered by entry F–2520 exported by Eastern Canada Forest Products, Inc., as to which entry the protest is overruled. Judgment will be entered accordingly.

---

6. The trial judge reserved decision on the admissibility of these documents (defendant's exhibit B). They are received in evidence on the established principle that admissions by the beneficial party or real party in interest (i. e., the consignee) are admissible in evidence against the nominal plaintiff representing his interests. E. g., Krebs Pigment & Chemical Co. et al. v. Sheridan, 79 F.2d 479, 480 (3d Cir. 1935); Colonial Oil Co. v. United States Guarantee Co., 56 F.Supp. 545, 547 (S.D.Ga.1944); IV Wigmore, Evidence (3d ed.) § 1077; 31A C.J.S. Evidence § 320.