(C.D. 3960)

PACIFIC HARDWOOD SALES CO.
JUDSON SHELDON INT'L. CORP.    *v.* UNITED STATES

United States Customs Court, First Division

(Decided January 30, 1970)

*Glad & Tuttle* (*George R. Tuttle, Jr.,* of counsel) for the plaintiffs.
*William D. Ruckelshaus,* Assistant Attorney General (*Dominick M. Minerva* and *Brian S. Goldstein,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The two protests in this case, which were consolidated for purposes of trial and determination, cover importations from Taiwan, entered at the port of San Francisco. The merchandise referred to in the entry papers as "drawer sides", was classified for customs duty purposes within the purview of item 727.40 of the Tariff Schedules of the United States (hereinafter referred to as TSUS) as "Parts of furniture", and was subjected to duty at the rate of 17 per centum ad valorem.

Although plaintiffs have made various claims, they appear to rely solely on the claim for classification of the importations in item 202.53 of the TSUS, which provides duty at the rate of 5 per centum ad valorem. The language of item 202.53 in its context, together with pertinent explanatory headnotes, is set forth as follows:

"Lumber and wood siding, drilled or treated; and edge-glued or end-glued wood not over 6 feet in length or over 15 inches in width, whether or not drilled or treated:

| | | |
|---|---|---|
| 202.52 | Softwood lumber and siding, drilled, or pressure treated with creosote or other wood preservative, or both, but not otherwise treated_____ | 1.5% ad val. |
| 202.53 | Hardwood, edge-glued or end-glued, not drilled or treated_____ | 5% ad val. |
| 202.54 | Other _____ | 10% ad val." |

Schedule 2, Part 1.

"Subpart B.—Lumber, Flooring, and Moldings
Subpart B headnotes:

1. This subpart covers lumber, wood siding, wood flooring, wood moldings, and certain wood carvings and ornaments, including such products when they have been drilled or treated.

2. For the purposes of this part, the following terms have the meanings hereby assigned to them:

(a) Lumber: A product of a sawmill or sawmill and planing mill derived from a log by lengthwise sawing which, in its original sawed condition, has at least 2 approximately parallel flat longitudinal sawed surfaces, and which may be rough, dressed, or worked, as set forth below:

(i) rough lumber is lumber just as it comes from the saw, whether in the original sawed size or edged, resawn, crosscut, or trimmed to smaller sizes;

(ii) dressed lumber is lumber which has been dressed or surfaced by planing on at least one edge or face; and

(iii) worked lumber is lumber which has been matched (provided with a tongue-and-grooved joint at the edges or ends), shiplapped (provided with a rabbeted or lapped joint at the edges), or patterned (shaped at the edges or on the faces to a patterned or molded form) on a matching machine, sticker, or molder.

Edge-glued or end-glued wood over 6 feet in length and not over 15 inches in width shall be classified as lumber if such wood as a solid piece without glue joints would be deemed to be lumber as defined above.

(b) Softwood: Wood from trees of coniferous species (order Coniferae).

(c) Hardwood: Wood from trees of non-coniferous species.

(d) Drilled or treated: Drilled at intervals for nails, screws, or bolts, sanded or otherwise surface processed in lieu of, or in addition to, planing or working, or treated with creosote or other wood preservatives, or with fillers, sealers, waxes, oils, stains, varnishes, paints, or enamels, but not including anti-stain or other temporary applications mentioned in headnote 4 of this subpart."

The following facts were stipulated and agreed to by the parties:

"That the items marked "A" and initialed $\frac{\text{MAM}}{\text{(Import Specialist's Initials)}}$ by $\frac{\text{Milton A. Murayama}}{\text{(Import Specialist's Name)}}$ on protest 65/4197 are in fact 3/8″ thick, 6⅞″ wide, and 15, 16, 17, 21½ and 28⅜″ long, are of 2 piece construction and made from lauan wood.

That the items marked "A" and initialed $\frac{\text{MAM}}{\text{(Import Specialist's Initials)}}$ by $\frac{\text{Milton A. Murayama}}{\text{(Import Specialist's Name)}}$ marked on protest 66/7416 are in fact 3/8″ thick, 6⅞″ wide, and 14, 15, 16, 21¼″ or 28⅜″ long, are of 2 piece construction, and are made from lauan wood.

That lauan wood is the wood of a non coniferous species of tree."

It is well settled in customs law that, in addition to overcoming the presumption of correctness attaching to the action of customs

officials in classifying merchandise for duty purposes, plaintiffs have the burden of proving the correctness of their claimed classification. *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, C.A.D. 935 (1968).

From the foregoing stipulation of the parties, two of the requisite points of proof resting upon plaintiffs herein to bring the importations within the purview of item 202.53 have been satisfied, to wit, that since the merchandise in controversy is wood of a non-coniferous species of tree, it consists of hardwood, and that in dimensions it is "not over 6 feet in length or over 15 inches in width". During the course of the trial, it was further agreed that the merchandise was edge-glued.

For other essential elements of proof, the court has examined the testimonial record and the physical exhibits.

Five witnesses testified at the trial, three on behalf of plaintiffs and two for defendant, all of whom were experienced in either the lumber or furniture manufacturing business. From their testimony the following facts are gleaned. The merchandise in controversy, represented by plaintiffs' exhibit 1, is produced from the many strips and short pieces remaining after lumber is manufactured from logs. These strips and short pieces are resawn to proper thickness, usually by band saw or similar device. The pieces are then surfaced on two edges to various widths, some as narrow as one inch. The material is placed in a gluing machine and glued into long strips of various widths by an electronic gluing process. It is then ripped to the required widths, with allowance made for subsequent surfacing. The material is placed in a surfacing machine, also known as a matcher or a molder, which surfaces the four sides, automatically spaces the groove, and eases the edge. The surfacing referred to was described as synonymous to planing. The only remaining thing to be done to produce merchandise such as exhibit 1 is to cut it to the size specified in purchase orders. This cutting is only to size of tolerance, the size necessary to allow a certain tolerance in width, thickness, and in length. The material had not been sanded in any form prior to importation. The groove on exhibit 1 is provided for the purpose of inserting a thin piece of plywood as a drawer bottom. Exhibit 1 represents the merchandise as it is imported into the United States.

According to the evidentiary record, before the merchandise can be utilized as drawer sides, additional manufacturing processes must be performed. Since in furniture manufacturing the length must be exact, the material must be sized for length. It must be sanded to eliminate tears and defects, or the defects must be filled with putty to produce a finished product. The ends of the drawer sides must be dovetailed, a process by which a series of fantails or extensions are

cut on each end of the drawer sides for fitting and gluing into notches on drawer fronts and backs to form tight joinings.

The witnesses referred to the merchandise in its imported condition as "drawer side lumber", "partly manufactured lumber", or as "dimensioned stock". A sample, representative of the imported merchandise after it had been subjected to recutting, sanding, and dovetailing, was received in evidence as plaintiffs' exhibit 2.

Although research does not uncover any prior litigation wherein claim was made for classification of drawer side material in item 202.53 of the TSUS, there is precedent under the Tariff Act of 1930 in the cases of *B. A. McKenzie & Co., Inc.* v. *United States*, 39 Cust. Ct. 52, C.D. 1903 (1957), and *Border Brokerage Co. et al.* v. *United States*, 52 Cust. Ct. 204, C.D. 2461 (1964).

The merchandise in the *McKenzie* case consisted of 2-piece edge-glued lumber which had been planed, tongued and grooved. It had been classified as manufactures of wood, not specially provided for, in paragraph 412 of the Tariff Act of 1930, as modified, and subjected to duty at the rate of 16⅔ per centum ad valorem. The court held that it was entitled to entry free of duty within the provision in paragraph 1803 of the 1930 Act for "sawed lumber and timber, not further manufactured than planed, and tongued and grooved; * * * not specially provided for". That the material had been subjected to a process whereby two narrow pieces of wood were glued under pressure to form one wide piece of wood, was deemed by the court not to have changed its *per se* character as lumber. The court noted further that:

> "* * * the imported 2-piece stock is found to be material made of wood by processes of sawing, planing, tonguing, and grooving, designed to be used and fit only for use in the manufacture of drawer sides. It is not, in its imported condition, drawer sides, and requires much further manufacturing effort to make it such. It is not otherwise specially provided for and is, therefore, properly classifiable under paragraph 1803 (1), *supra*, as claimed."

Merchandise similar to that in the *McKenzie* case, was the subject of decision in the *Border Brokerage* case, and the record in the *McKenzie* case was incorporated therein. In the *Border Brokerage* case the question presented was whether bullnosing, easing, and grooving of 1-piece and 2-piece cedar shorts or pattern stock prior to importation "further manufactured" the merchandise beyond the condition of wood material, lumber, entitled to entry free of duty in paragraph 1803 (1) of the 1930 Tariff Act. The record evidence therein indicated that both the 1-piece and the 2-piece stock were ultimately used as sides of drawers for furniture. It also disclosed that after importation, in order to fit the merchandise for its ultimate

use, it sometimes had to be recut to width and regrooved and "in any event, it is cut to length, chamfered, dovetailed, sanded, and beveled." The court in the *Border Brokerage* case held that the bull-nosing, easing and grooving of the cedar pattern stock there involved prior to importation, which work was done on a single machine, was only a planing operation and did not change the *per se* character of the lumber. The court concluded, as in the *McKenzie* case that the merchandise in its imported condition was not "drawer sides" but required further manufacturing processes to fit it for that purpose. Plaintiff's claim for free entry of the merchandise, as "sawed lumber and timber, not further manufactured than planed, and tongued and grooved; * * * not specially provided for" in paragraph 1803 (1) of the Tariff Act of 1930, was consequently sustained.

The broad coverage of paragraph 1803 of the Tariff Act of 1930 has been provided for with greater particularity in Schedule 2, Part 1 of the TSUS. Nevertheless, for merchandise of the kind presently before the court, it appears to have been the intention of Congress to carry over to the tariff schedule provisions the judicial construction given to paragraph 1803 of the 1930 Tariff Act in the *McKenzie* and *Border Brokerage* cases.

The record in the case at bar establishes that the merchandise in issue is hardwood, that it is edge-glued, that it has not been drilled or treated, and that it is not over 6 feet in length or over 15 inches in width. It appears, therefore, to meet all of the requirements of the claimed item 202.53 of the TSUS. This conclusion finds corroboration in the following "explanation" appearing at page 9 of the Fifth Supplemental Report to the Tariff Classification Study, which sets forth the reason for the addition of item number 202.53 to the TSUS:

> "*Explanation:* * * * The new provision, item 202.53, takes into account the equities involved in customs practices relating to glued-up hardwood (see, for example, TDs 54595 and 55708(1)). By virtue of headnote 2(a) of part 1B, the provisions of the new schedules relating to lumber, rough, dressed, or worked, apply to—
>
>> 'Edge-glued or end-glued wood over 6 feet in length and not over 15 inches in width * * * if such wood as a solid piece without glue joints would be deemed to be lumber as defined above [in the same headnote].'

Thus, the new schedules apply the lumber rates of duty to all glued-up wood covered by the present practices, except that which is either not over 6 feet in length or is over 15 inches in width. It appears that a substantial volume of glued-up hardwood falls in this latter category, and would be dutiable at the higher rate of 10 percent ad valorem under the new schedules in the absence of a change in the provisions.

"The existing customs practice is to treat as lumber glued-up wood having a width no wider than the maximum width of one-piece or solid lumber of the particular species involved. As the Commission stated in its original report of November 15, 1960, the matter is not one which can be clearly resolved by adherence to the principle of these rulings. Although any attempt to provide a logical, systematic treatment of glued-up wood involves the drawing of arbitrary lines of demarcation, the dimensions set forth in headnote 2(a) for glued-up wood are believed to be reasonable and desirable. *For the most part glued-up wood not over 6 feet in length or over 15 inches in width is dimension stock fabricated to specification and can be regarded only loosely as lumber.* Very often such dimension stock is used in applications where one-piece lumber is not best suited for use due to its greater tendency to warp and split.

"In the circumstances, and to balance the equities involved in existing customs practices, the foregoing new provision has been introduced. This provision applies a compromise rate of 5 percent ad valorem to all glued-up hardwood lumber not conforming to the provisions of headnote 2(a) because of such glued-up stock being too short or too wide, or both." [Italics supplied.]

Further corroboration is contained in the following statement in the Summaries of Trade and Tariff Information, Schedule 2, Volume 1, Wood and Related Products I, at page 104:

"Glued-up lumber, as well as glued-up wood in sizes that for tariff purposes do not qualify as lumber, has become increasingly accepted for many purposes. Glued-up hardwood lumber can be used interchangeably with one-piece lumber for some factory-produced articles, particularly where the joint is hidden from view or where the joint will be covered, such as by painting. *Glued up hardwood other than lumber is used particularly for furniture, household and store fixtures, and other factory-produced articles.*" [Italics supplied.]

In light of the foregoing, the court concludes that the merchandise at bar, shown by the record to be "dimension stock" composed of edge-glued hardwood, which has been surfaced, eased, and grooved, constitutes drawer side material from which, subsequent to importation, drawer sides will be produced after further processing steps of recutting, sanding, and dovetailing have been performed, is the type of material Congress intended to include within the purview of item 202.53 of the TSUS.

An interesting analogy is found in the case of *A. N. Deringer, Inc.* v. *United States*, 61 Cust. Ct. 66, C.D. 3530 (1968). The merchandise in the *Deringer* case consisted of "horsefeathers", the production of which was described by the court in the following language:

"* * * to produce horsefeathers one starts by sawing a log (longitudinally) into boards or planks, which are then likewise center resawn (longitudinally); that the original boards, as well as the center resawn boards, have at least two approximately parallel longitudinal sawed surfaces; that the resawn boards are simply resawn again longitudinally at an angle or bevel to produce horsefeathers; and that the only other sawing required is the cross-cutting of the boards to length. The record also establishes that the original sawed product and the resawn product (exhibits 1 and 2) cannot be used in the same manner as horsefeathers, which are the final beveled product, and that the beveling causes a change in use. Thus, the essential difference between the original sawed and resawn products (exhibits 1 and 2) and horsefeathers is that the horsefeathers have been resawn from the original piece of lumber and are made for a special purpose."

The merchandise had been classified upon importation as articles of wood, not specially provided for, in item 207.00 of the TSUS, and subjected to duty at the rate of 16⅔ per centum ad valorem. The court sustained the plaintiff's claim for classification of the horse-feathers as rough spruce lumber in item 202.03 which provides for duty at the rate of 35 cents per thousand feet, board measure. In the course of the opinion, the court noted:

"* * * it is apparent that the classification of horsefeathers as lumber is in no way changed because horsefeathers are 'used for one thing only' or are so far advanced that they 'can be used only for a definite purpose.' Indeed, the language of the tariff schedules makes it clear that various specified articles (e.g., soft-wood flooring, hardwood flooring, molding) are properly dutiable as lumber even though they are usable only for a single purpose and are known by a separate name other than 'lumber.'"

The court is of the opinion that the rationale of the *Deringer* case applies to the facts of the case at bar even though the merchandise in issue is drawer side material to be "used for one thing only", to wit, the making of drawer sides. The merchandise herein is encompassed by the specifically worded provision in item 202.53 for hardwood, edge-glued, not drilled or treated, within the designated dimensions, which according to the legislative intent previously set forth, from the Tariff Classification Study and Summaries of Trade and Tariff Information, was to apply to dimension stock, fabricated to specification, for use in the making of furniture.

Plaintiffs also contend that the controverted merchandise was improperly classified as parts of furniture in item 727.40 in view of the language of the TSUS General Interpretative Rule 10 (ij) which reads:

"a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part."

The court agrees with plaintiffs' contention. Even granting without conceding in view of the *McKenzie* and *Border Brokerage* cases, that the merchandise as imported comprised parts of furniture of the kind provided for in item 727.40, the court is nevertheless of the opinion, predicated on the specificity of the language of item 202.53, the limitations on the application of the provision to hardwood meeting certain dimensional and other requirements, and the fact that item 202.53 was added to the TSUS for the sole purpose of providing for such dimension stock fabricated to specification as is here before the court, that item 202.53 is such a specific provision as will prevail over a provision for "parts" of an article. To paraphrase language used by this court in the case of *West Coast Glass Distributors* v. *United States*, 62 Cust. Ct. 444, C.D. 3797 (1969), with regard to the application of General Interpretative Rule 10(ij)—

"* * * There are so many descriptive tariff provisions in TSUS that each case must, necessarily, be decided on its own relative terms. Failure to designate a 'part' by its particular name or function (i.e. * * * [drawer side material]) cannot, in our opinion, lessen the specificity of an existing tariff provision, such as it is."

Upon the record before the court, after due consideration of the cases cited by the parties in their briefs, and for the reasons herein set forth, it is the decision of the court that the claim of plaintiffs for classification of the instant merchandise within the purview of item 202.53 of the TSUS and the consequent imposition of duty at the rate of 5 per centum ad valorem should be sustained. All other claims are overruled.

Judgment will be entered accordingly.